HANSON BRIDGETT LLP
NOEL M. COOK (SBN 122777)
ncook@hansonbridgett.com
GARNER K. WENG (SBN 191462)
gweng@hansonbridgett.com
JANIE L. THOMPSON (SBN 291622)
jthompson@hansonbridgett.com
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:    (415) 777-3200
Facsimile:    (415) 541-9366

DICKENSON, PEATMAN & FOGARTY
J. SCOTT GERIEN (SBN 184728)
sgerien@dpf-law.com
JOY L. DURAND (SBN 245413)
jdurand@dpf-law.com
1455 First Street, Suite 301
Napa, California 94559
Telephone:    (707) 252-7122
Facsimile:    (707) 255-6876

Attorneys for Plaintiff
JaM CELLARS, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JaM CELLARS, INC.,<br><br>                    Plaintiff,<br><br>          v.<br><br>THE WINE GROUP LLC,<br><br>                    Defendant. | Case No. 4:19-cv-01878-HSG<br>(Consolidated Case)<br><br>**DECLARATION OF JOY L. DURAND IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:    July 9, 2020<br>Time:    2:00 p.m.<br>Dept:    Courtroom 2, 4th Floor<br>Judge:   Hon. Haywood S. Gilliam, Jr. |

I, Joy L. Durand, declare as follows:

1.      I am an attorney in good standing licensed to practice by the State Bar of

California. I am an associate with the law firm of Dickenson, Peatman & Fogarty, located at 1455

First Street, Suite 301, Napa, California 94559. I am counsel of record for Plaintiff JaM Cellars,

and make this Declaration in support of Plaintiff JaM Cellars, Inc's Motion for Preliminary

1  Injunction. I have personal knowledge of the facts stated in this declaration and, if called upon,

2  could and would competently testify to them. All of the matters stated here are known to me

3  personally, unless stated on information and belief; and with regard to those statements, I am

4  informed and reasonably believe them to be true.

5  2.     Attached hereto as Exhibit A is a true and correct copy of excerpts from the

6  December 18, 2019 deposition of John Truchard ("Truchard Depo"), which was taken in a related

7  action involving the same parties, captioned *JaM Cellars, Inc. vs. The Wine Group, LLC*, 19-cv-

8  1878-HSG (N.D. Cal.) (hereinafter "*JaM I*").

9  3.     Attached hereto as Exhibit B is a true and correct copy of Defendant's Exhibit No.

10  16 from the December 4, 2019 deposition of Jeff Dubiel, which is a document produced by TWG

11  in *JaM I* as TWG0008207-TWG0008219.

12  4.     Attached hereto as Exhibit C is a true and correct copy of Defendant's Exhibit No.

13  15 from the December 4, 2019 deposition of Jeff Dubiel in *JaM I*, which is a document produced

14  by TWG in *JaM I* as TWG0001037, TWG0001042-TWG0001043.

15  5.     Attached hereto as Exhibit D is a true and correct copy of a printout from Wine

16  Business Monthly dated February 27, 2020.

17  6.     Attached hereto as Exhibit E is a true and correct copy of Plaintiff's Exhibit No. 19

18  from the December 4, 2019 deposition of Jeff Dubiel in *JaM I*.

19  7.     Attached hereto as Exhibit F is a true and correct copy of excerpts from the

20  December 4, 2019 deposition of Jeff Dubiel, which was taken in *JaM I*.

21  8.     Attached hereto as Exhibit G is a true and correct copy of a document produced by

22  Defendant The Wine Group LLC ("TWG") in *JaM I* as TWG0001020-TWG0001023.

23  9.     Attached hereto as Exhibit H is a true and correct copy of a document produced by

24  TWG in *JaM I* as TWG0014497.

25  10.     Attached hereto as Exhibit I is a true and correct copy of pages excerpted from the

26  December 6, 2019 deposition of Collin Cooney, which was taken in *JaM I*.

27  11.     Attached hereto as Exhibit J is a true and correct copy of Plaintiff's Exhibit No. 42

28  from the December 4, 2019 deposition of Jeff Dubiel in *JaM I*.

12.     Attached hereto as Exhibit K is a true and correct copy of a document produced by TWG in *JaM I* as TWG0013599, TWG0013604, TWG0013605, TWG0013608, TWG0013616, TWG0013623.

13.     Attached hereto as Exhibit L is a true and correct copy of Plaintiff's Exhibit No. 3 from the December 4, 2019 deposition of Jeff Dubiel in *JaM I*.

14.     Attached hereto as Exhibit M is a true and correct copy of the Application For And Certification/Exemption of Label/Bottle Approval (COLA) for the Chardonnay wine called BUTTERKISSED under the CUPCAKE line of wines.

15.     Attached hereto as Exhibit N is a true and correct copy of the complaint filed by JaM Cellars, Inc. against The Wine Group LLC on April 25, 2017, Case 3:17-cv-02333.

16.     Attached hereto as Exhibit O is a true and correct copy of a document produced by TWG in *JaM I* as TWG0016772.

17.     Attached hereto as Exhibit P is a true and correct copy of Plaintiff's Exhibit No. 37 from the December 4, 2019 deposition of Jeff Dubiel, which is a document produced by TWG in *JaM I* as TWG0000343-TWG0000347.

18.     Attached hereto as Exhibit Q is a true and correct copy of Plaintiff's Exhibit No. 9 from the December 4, 2019 deposition of Jeff Dubiel, which is a document produced by TWG in *JaM I* as TWG0000694, TWG0000696.

19.     Attached hereto as Exhibit R are true and correct copies of documents produced by TWG in *JaM I* as TWG0014518-TWG0014519, TWG0014527, TWG0014531-TWG0014535, TWG0014538-TWG0014539.

20.     Attached hereto as Exhibit S is a true and correct copy of Plaintiff's Exhibit No. 49 from the December 6, 2019 deposition of Collin Cooney in *JaM I*.

21.     Attached hereto as Exhibit T are a true and correct copies of documents produced by TWG in *JaM I* as TWG0006214-TWG0006238.

22.     Attached hereto as Exhibit U is a true and correct copy of Exhibit 120 from the January 13, 2020 deposition of Winter Designs witness Bahia Sommers in *JaM I*, which is a document produced by Winter Designs in *JaM I* as WD0000049.

23.     Attached hereto as Exhibit V is a true and correct copy of pages excerpted from the January 13, 2020 deposition of Winter Designs witness Bahia Sommers, which was taken in *JaM I*.

24.     Attached hereto as Exhibit W is a true and correct copy of Plaintiff's Exhibit No. 44 from the December 6, 2019 deposition of Collin Cooney, which is a document produced by TWG in *JaM I* as TWG0014474–TWG0014476, TWG0014497.

25.     Attached hereto as Exhibit X is a true and correct copy of Exhibit No. 11 from the December 4, 2019 deposition of Jeff Dubiel, which is a document produced by TWG in *JaM I* as TWG0000535, TWG0000579-TWG0000581.

26.     Attached hereto as Exhibit Y is a true and correct copy of Plaintiff's Exhibit No. 51 from the December 6, 2019 deposition of Collin Cooney, which is a document produced by TWG in *JaM I* as TWG0016338-TWG0016354.

27.     Attached hereto as Exhibit Z is a true and correct copy of Exhibits 121-123 from the January 13, 2020 deposition of Winter Designs witness Bahia Sommers in *JaM I*, which are documents produced by Winter Designs in *JaM I* as WD0000384-WD0000404, WD0000212-WD0000232, WD0000711-WD0000720.

28.     Attached hereto as Exhibit AA is a true and correct copy of Exhibit 127 from the January 13, 2020 deposition of Winter Designs witness Bahia Sommers in *JaM I*, which is a document produced by Winter Designs in *JaM I* as WD0000102-WD0000105, WD0000026-WD0000027.

29.     Attached hereto as Exhibit BB is a true and correct copy of Plaintiff's Exhibit No. 18 from the December 4, 2019 deposition of Jeff Dubiel which is a document produced by TWG in *JaM I* as TWG0001205-TWG0001214.

30.     Attached hereto as Exhibit CC is a true and correct copy of Defendant's Exhibit Nos. 23-27 from the December 4, 2019 deposition of Jeff Dubiel, produced by Jeff Dubiel Exhibit Nos. 23-27.

31.     Attached hereto as Exhibit DD is a true and correct copy of Plaintiff's Exhibit No. 45 from the December 6, 2019 deposition of Collin Cooney, which is a document produced by

TWG in *JaM I* as TWG0007742-TWG0007743.

32.     Attached hereto as Exhibit EE is a true and correct copy of Plainitff's Exhibit No. 60 from the December 6, 2019 deposition of Collin Cooney, which is a document produced by TWG in *JaM I* as TWG0016801-TWG0016803.

33.     Attached hereto as Exhibit FF is a true and correct copy of Plaintiff's Exhibit No. 12 from the December 4, 2019 deposition of Jeff Dubiel, which is a document produced by TWG in *JaM I* as TWG0000406-TWG0000408.

34.     Attached hereto as Exhibit GG is a true and correct copy of Plaintiff's Exhibit No. 46 from the December 6, 2019 deposition of Collin Cooney, which is a document produced by TWG in *JaM I* as TWG0011101-TWG0011102, TWG0013435-TWG0013437.

35.     Attached hereto as Exhibit HH is a true and correct copy of Plaintiff's Exhibit No. 59 from the December 6, 2019 deposition of Collin Cooney, which is a document produced by TWG in *JaM I* as TWG0000689.

36.     Attached hereto as Exhibit II is a true and correct copy of an article printout 2019 The Visual Ecology of Product Packaging article written by Jacob L. Orquin.

37.     Attached hereto as Exhibit JJ is a true and correct copy of the settlement agreement, fully executed on July 12, 2018, between JaM Cellars and The Wine Group in United States District Court for the Northern District of California, Case No. 3:17-CV-02333.

38.     Attached hereto as Exhibit KK is a true and copy of the U.C. Davis "wine wheel," which was filed by Defendant with this Court in *JaM I* (ECF No. 36-3).

39.     Attached as Exhibit LL is a true and correct copy of a printout from Imagery Estate Winery.

40.     Attached as Exhibit MM is a true and correct copy of a printout from Barefoot & Naked Grape.

41.     On February 18, 2020, I purchased a box of The Wine Group's RICH & BUTTERY wine. I measured from the top of the term "RICH" to the bottom of the term "BUTTERY" as they appear on the front of the box and it measured 4.25 inches high. I also measured from the top to the bottom of the term "FRANZIA" as it appears on the front of the box

Case No. 4:19-cv-01878-HSG
(Consolidated Case)
-5-
DURAND DECL ISO PLTF JaM CELLARS, INC.'S MOTION FOR PRELIMINARY INJUNCTION

16543988.1

1    and it measured 1.5 inches high. I also measured from the top to the bottom of the term

2    "BUTTERY" as it appears on the front of the box and it measured 2 inches high.

3

4         I declare under the penalty of perjury under the laws of the United States of America that

5    the foregoing is true and correct.

6         Executed this 14th day of May, 2020 at Santa Rosa, California.

7

8                                         _____/s/ Joy L. Durand_____
                                                        Joy L. Durand
9

10

11        I hereby attest that I have on file all holographic signatures corresponding to any signatures

12   indicated by a conformed signature (/S/) within this e-filed document.

13

14   Dated: May 14, 2020                   _____/s/ Janie L. Thompson_____
                                                        Janie L. Thompson
15

16

17

18

19

20

21

22

23

24

25

26

27

28

16543988.1   DURAND DECL ISO PLTF JaM CELLARS, INC.'S MOTION FOR PRELIMINARY INJUNCTION

# EXHIBIT A

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# PORTIONS SOUGHT TO BE FILED UNDER SEAL

1            UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3                OAKLAND DIVISION

4   JAM CELLARS, INC.,              )
                                    )
5               Plaintiff,          )
                                    )
6   vs.                            )   No.
                                    )   4:19-cv-01878-HSG
7   THE WINE GROUP LLC,            )
                                    )
8               Defendants.        )
    _____ )
9                                   )
    AND RELATED COUNTERCLAIMS.     )
10  _____ )

11

12

13            ATTORNEYS' EYES ONLY

14          DEPOSITION OF JOHN TRUCHARD

15                 Volume I

16              Napa, California

17        Wednesday, December 18th, 2019

18

19

20

21   REPORTED BY:
     MONICA LEPE-GEORG
22   CSR No. 11976

23   Job No. 10064515

24

25

1

2

3          DEPOSITION OF JOHN TRUCHARD, VOLUME NO. I,

4   taken on behalf of Defendant/Counterclaimant, at

5   1455 First Street, Suite 301, Napa, California,

6   beginning at 8:26 a.m. and ending at 3:37 p.m., on

7   Wednesday, December 18th, 2019, before Monica

8   Lepe-Georg, Certified Shorthand Reporter No. 11976.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1    ownership?

2        A.    That's correct.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22        Q.    All right.   And when was JaM Cellars, Inc.,

23    formed?

24        A.    I believe we incorporated in April of 2010.

25        Q.    What was the first vintage of wine that was

1  produced by JaM Cellars?

2      A.   2007, JaM Cabernet.

3      Q.   So the wine was produced and presumably was

4  aging in casks before you formed the company?

5      A.   That is correct.

6      Q.   Did you produce the wine or did you buy it

7  from somebody else who had made the wine?

8      A.   That wine was produced by John Anthony

9  Vineyards.

10     Q.   And what was the first vintage of

11 Chardonnay that JaM Cellars produced?

12     A.   2009.

13     Q.   And was it John Anthony Vineyards that made

14 that as well?

15     A.   That is correct.

16     Q.   Okay.  Did you have the concept of JaM

17 Cellars in mind when you or Mr. Lloyd produced that

18 wine?

19     A.   We did not.

20     Q.   Okay.  What brands of wine does John

21 Anthony Vineyards produce?

22     A.   Brands distinct from varietals.

23          So brands for John Anthony Vineyards would

24 be John Anthony.

25          We have a wine brand called FARM Napa

1   had originated with someone other than either JaM

2   Cellars or Mr. Lloyd; is that right?

3        A.    That is correct.

4        Q.    Okay.  And he indicates, in a couple

5   places, I believe, that his clients, you, would ask

6   the responsible parties to remove these signs that

7   had been challenged, and that if future signs are

8   created/challenged that they will do the same as to

9   those.  Is that fair?

10       A.    Upon being made aware of them by a Rombauer

11   representative, that is correct.

12       Q.    Okay.  And is it true that, in your

13   industry, the wine producers can't control what is

14   actually said at retail about their wines?  They can

15   ask and they can suggest, but they can't have

16   ultimate control over what appears to the consumer

17   at a retail outlet for their products.

18       A.    Well, I suppose if the retailer was doing

19   something that somehow violated a trademark or

20   was -- was doing something that -- that -- I don't

21   know, I guess, is the --

22            As a general rule, the retailers have a lot

23   of control and discretion over what they -- how they

24   promote the brands and the language they use.  Maybe

25   there could be some scenario under which a retailer

1   was doing something that somehow violated our -- our

2   trademark that I could have an issue with that would

3   be actionable, but as a general rule, you -- I think

4   the statement stands, is a fair statement, which is

5   retailers do what they want to do to help sell and

6   promote their products and we can't really dictate

7   to them, as long as it's not violating any -- any

8   law, by how they promote those products.  It's very

9   difficult to control that.

10       **Q.   And that's because there's some sort of**

11  **three-tiered distribution system in the wine**

12  **industry that allows distributors to talk to**

13  **retailers about what they have on the shelves and**

14  **even to handle the products, but it does not allow**

15  **the wine producers to do that; is that right?**

16       A.   Yeah, it -- generally speaking, I think

17  you're correct.  There are 50 states and 50

18  different rules and it gets pretty complicated

19  pretty quickly, but as a -- as a general concept, I

20  would agree with what you're saying.

21       **Q.   So, is one of the reasons that Mr. Reidl is**

22  **saying that you'll try to get point-of-sale pieces**

23  **that Rombauer is challenging taken down is because**

24  **you don't have ultimate control over it?**

25       A.   That's correct.  We -- we could not

1        Q.    But you agreed with me that you don't know
2    whether diacetyl is an ingredient of butter,
3    correct?

4        A.    That is correct, and while I agree that --
5    I don't know if diacetyl is an ingredient or is a
6    chemical component of butter -- would still be a
7    true statement that butter is not an ingredient to
8    our wine, because butter will include a lot of other
9    attributes, components, molecules that would be
10   independent of the diacetyl.

11       Q.    Now, you -- you say that butter is
12   suggestive of a character -- characteristic of wine.

13       A.    Uh-hm.

14       Q.    Why are you drawing a description -- a
15   distinction between a descriptive -- a descriptive
16   term and a suggestive term in this answer?

17       A.    Because, to me, descriptive would be a kind
18   of adjective, so you're describing the wine and
19   "buttery" would be descriptive; where butter is a
20   dairy product and it's suggestive.  And it's like
21   Microsoft is suggestive of software for
22   microcomputers.  It's suggestive of that product.

23             You can make an argument, it's -- for the
24   average person, it's arbitrary.  They may make no
25   connection with it.  They're calling Apple a

Volume I                    Attorneys' Eyes Only
John Truchard                        Jam Cellars v.s The Wine Group

1    computer; a computer, Apple.  I would suggest for

2    the majority of consumers that Apple is neither

3    descriptive or suggestive.  It's arbitrary.  They

4    don't even get the connection.

5            Again, us oenophiles and intellectuals will

6    sit there and make these distinction and arguments;

7    the average person walking in does not do that, I

8    believe -- I believe.

9        Q.    Well, I assume that you think a lot of

10   average people buy and use your wine; is that right?

11       A.    I think we get a -- I think we get the full

12   cross-section, from oenophiles to people that are

13   first-time wine testers.

14       Q.    So, do you agree that in order to convey a

15   message to somebody who is not that experienced with

16   wine, you need to be more emphatic about it -- about

17   it?

18           MR. GERIEN:  I'm not sure I understand the

19   question.

20           What do you mean "emphatic"?

21           MR. GILCHRIST:  You can answer.

22           THE WITNESS:  Well, not to repeat Scott

23   'cause I was thinking --

24           Can you rephrase the question in a

25   different way?  I want to give you a fair answer.

1           I, the undersigned, a Certified Shorthand

2      Reporter of the State of California, do hereby

3      certify:

4           That the foregoing proceedings were taken

5      before me at the time and place herein set forth;

6      that any witnesses in the foregoing proceedings,

7      prior to testifying, were placed under oath; that a

8      verbatim record of the proceedings was made by me

9      using machine shorthand which was thereafter

10     transcribed under my direction; further, that the

11     foregoing is an accurate transcription thereof and

12     review of the transcript was requested.

13           I further certify that I am neither

14     financially interested in the action nor a relative

15     or employee of any attorney of any of the parties.

16           IN WITNESS WHEREOF, I have this date

17     subscribed my name.

18

19     Dated:   December 29th, 2019

20

21

22
       _____
       MONICA LEPE-GEORG, No. 11976
23

24

25

# EXHIBIT B

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT C

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT D

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# WINE BUSINESS MONTHLY

February 2020 • $5.95    The Industry's Leading Publication for Wineries and Growers    www.winebusiness.com

## REVIEW OF THE INDUSTRY

**WBM**



# 50

## LARGEST WINERIES

**+HOT**BRANDS | DISTRIBUTORS | WINERIES



February 27, 2020
CIA at Greystone
Napa Valley

**Register Today!**

INNOVATION+QUALITY *Preview*
- Lifetime Innovator Award Winner, Roger Boulton
- Sixth Annual Product Award Winners
- The Best Trials of the Year



REVIEW OF THE INDUSTRY

# WINERY PROFILES

## E. & J. Gallo Winery

**Stephanie Gallo**, Chief Marketing Officer
**ANNUAL U.S. CASE SALES VOLUME:** 70 million (*WBM* Estimate)
**GLOBAL CASE SALES VOLUME (2019):** 80 million
**EMPLOYEES:** 4,000



E. & J. Gallo Winery, the leading U.S. wine company, was scheduled to complete its purchase of a large portfolio of wine brands positioned at $11 retail and below from Constellation Brands by March 1, 2020, a deal encompassing names such as Clos du Bois, Black Box Wines, and Ravenswood Winery, as well as six big winemaking facilities. Gallo plans to revitalize the brands. Wineries included in the purchase are Mission Bell Winery in Madera, Turner Road Vintners in Lodi, Clos du Bois in Geyserville and Wild Horse Winery in Templeton, along with Washington state's The Hogue Cellars and Canandaigua Wine Co. in New York.

E. & J. Gallo also announced the purchase of two luxury priced Napa Valley brands in Nov. 2019: Pahlmeyer and Jayson by Pahlmeyer. E. & J. Gallo is leasing the Waters Ranch vineyard from the Pahlmeyer family and operating its tasting room.

E. & J. Gallo separately agreed to buy New Zealand-based Nobilo Wines and related assets from Constellation for $130 million, subject to FTC and New Zealand regulatory approval. According to a Constellation Brands statement, the case volume, including Nobilo, being sold to E. & J. Gallo represents approximately 22 million cases.

In March 2019, E. & J. Gallo unveiled the newly restored Louis M. Martini Winery in St. Helena in Napa Valley, a renovation that updates the historic building built in 1934. Auction Napa Valley's Barrel Auction was held at the restored historic winery in the summer.

E. & J. Gallo recently reintroduced Bartles & Jaymes wine coolers, which were popular in the 1980s. The company also introduced High Noon Sun Sips, a hard seltzer with real vodka and juice, and, most recently, Barefoot Wine hard seltzers. The company partnered with winemaker Dave Phinney to become the importer for Department 66 wines: Grenache, Syrah, Carignan and Mourvédre from the south of France.

"The story of Gallo is about what we're doing to meet the ever-changing needs of wine consumers," chief marketing officer Stephanie Gallo told *Wine Business Monthly*. "We want to welcome new consumers to the category."

Chief operating officer Ernest J. Gallo, son of president and CEO Joseph Gallo, and grandson of co-founder Ernest Gallo, is assuming the role of president and CEO effective in May 2020.

## The Wine Group

**Brian Vos**, CEO
**ANNUAL U.S. CASE SALES VOLUME:** 53 million
**EMPLOYEES:** 1,200



The Wine Group continues to focus on leading in value while simultaneously growing its premium business. It is one of the large wine U.S. companies that realized sales volume increases in 2019.

New introductions include Cupcake Butterkissed Chardonnay which, as the name implies, is an oaky, butter-flavored, malolactic-style Chardonnay. The Chloe Wines line continues to grow and now includes New Zealand Sauvignon Blanc. The Wine Group is building on its 2018 purchase of the 7 Deadly Zins brand and saw double-digit growth marketing and selling the McManis Family Vineyards line. The Imagery Estate Winery brand reached 150,000 cases last year.

Recent national brand launches have included Stave & Steel Wine Co. Bourbon Barrel-Aged Cabernet Sauvignon, and a commercial tier for Imagery Estate Winery—Imagery. The Wine Group purchased Benziger Family Winery and Imagery Estate Winery in Sonoma Valley back in 2015. Other major brands include Franzia Wines (which is, itself, a 20 million case brand); Mogen David Wine Co.; Big House Wines; Save Me, San Francisco Wine Co.; 10 Span Vineyards and Cocobon Wines.

"Value never goes out of style," Wine Group CEO Brian Vos said.

Established in 1981, The Wine Group is based in Livermore, California, at the historic Concannon Estate.

# EXHIBIT E

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION



PLAINTIFF'S EXHIBIT NO. 19
WITNESS: Dubiel
DATE: 12-4-19
Diane L. Freeman, CSR 5884

# EXHIBIT F

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT G

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT H

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT I

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT J

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT K

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT L

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT M

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

OMB No. 1513-0020

| FOR TTB USE ONLY | DEPARTMENT OF THE TREASURY ALCOHOL AND TOBACCO TAX AND TRADE BUREAU APPLICATION FOR AND CERTIFICATION/EXEMPTION OF LABEL/BOTTLE APPROVAL (See Instructions and Paperwork Reduction Act Notice on Back) |
|---|---|

TTB ID
19275001000814

| 1. REP. ID. NO. *(If any)* | CT 81 | OR 01 |
|---|---|---|

**PART I - APPLICATION**

| 2. PLANT REGISTRY/BASIC PERMIT/BREWER'S NO. *(Required)* BW-CA-616 | 3. SOURCE OF PRODUCT *(Required)* ☑ Domestic ☐ Imported | 8. NAME AND ADDRESS OF APPLICANT AS SHOWN ON PLANT REGISTRY, BASIC PERMIT OR BREWER'S NOTICE. INCLUDE APPROVED DBA OR TRADENAME IF USED ON LABEL *(Required)* |
|---|---|---|

| 4. SERIAL NUMBER *(Required)* 192943 | 5. TYPE OF PRODUCT *(Required)* ☑ WINE ☐ DISTILLED SPIRITS ☐ MALT BEVERAGE | CONCANNON VINEYARD, THE WINE GROUP LLC 4590 TESLA RD LIVERMORE CA 94550 CUPCAKE VINEYARDS (Used on label) |
|---|---|---|

6. BRAND NAME *(Required)*
CUPCAKE

8a. MAILING ADDRESS, IF DIFFERENT

7. FANCIFUL NAME *(If any)*

| 9. FORMULA | 10. GRAPE VARIETAL(S) *(Wine Only)* Chardonnay | 14. TYPE OF APPLICATION *(Check applicable box(es))* a. ☑ CERTIFICATE OF LABEL APPROVAL b. ☐ CERTIFICATE OF EXEMPTION FROM LABEL APPROVAL "For sale in _____ only" (Fill in State abbreviation.) c. ☐ DISTINCTIVE LIQUOR BOTTLE APPROVAL. TOTAL BOTTLE CAPACITY BEFORE CLOSURE _____ _____ (Fill in amount) d. ☐ RESUBMISSION AFTER REJECTION TTB ID. NO. _____ |
|---|---|---|

11. WINE APPELLATION *(If on label)*
CALIFORNIA

| 12. PHONE NUMBER (209) 879-6179 | 13. EMAIL ADDRESS | |
|---|---|---|

15. SHOW ANY INFORMATION THAT IS BLOWN, BRANDED, OR EMBOSSED ON THE CONTAINER (e.g., net contents) ONLY IF IT DOES NOT APPEAR ON THE LABELS AFFIXED BELOW. ALSO, SHOW TRANSLATIONS OF FOREIGN LANGUAGE TEXT APPEARING ON LABELS.
A) NET CONTENT MAY OR MAY NOT BE BLOWN INTO THE CONTAINER.B) LIVERMORE: BOTTLE CODE WILL HAVE JULIAN DATEYEAR TIMEPLANTLINEFILLER(E.G. 22806

## PART II - APPLICANT'S CERTIFICATION

Under the penalties of perjury, I declare; that all statements appearing on this application are true and correct to the best of my knowledge and belief; and, that the representations on the labels attached to this form, including supplemental documents, truly and correctly represent the content of the containers to which these labels will be applied. I also certify that I have read, understood and complied with the conditions and instructions which are attached to an original TTB F 5100.31, Certificate/Exemption of Label/Bottle Approval.

| 16. DATE OF APPLICATION 10/02/2019 | 17. SIGNATURE OF APPLICANT OR AUTHORIZED AGENT (Application was e-filed) | 18. PRINT NAME OF APPLICANT OR AUTHORIZED AGENT ANNE MARIE BELTRAN |
|---|---|---|

## PART III - TTB CERTIFICATE

This certificate is issued subject to applicable laws, regulations and conditions as set forth in the instructions portion of this form.

| 19. DATE ISSUED 10/04/2019 | 20. AUTHORIZED SIGNATURE, ALCOHOL AND TOBACCO TAX AND TRADE BUREAU *Sean Prather* |
|---|---|

## FOR TTB USE ONLY

| QUALIFICATIONS | |
|---|---|
| TTB has not reviewed this label for type size, characters per inch or contrasting background. The responsible industry member must continue to ensure that the mandatory information on the actual labels is displayed in the correct type size, number of characters per inch, and on a contrasting background in accordance with the TTB labeling regulations, 27 CFR parts 4, 5, 7, and 16, as applicable.<br><br>STATUS<br>THE STATUS IS APPROVED.<br><br>CLASS/TYPE DESCRIPTION<br>TABLE WHITE WINE | EXPIRATION DATE (If any) |

AFFIX COMPLETE SET OF LABELS BELOW

Image Type:

Brand (front) or keg collar
Actual Dimensions: 3.28 inches W X 3.41 inches H



Image Type:

Back
Actual Dimensions: 3.03 inches W X 3.14 inches H



# EXHIBIT N

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

J. SCOTT GERIEN, State Bar No. 184728
JOY L. DURAND, State Bar No. 245413
DICKENSON, PEATMAN & FOGARTY
1455 First Street, Suite 301
Napa, California 94559
Telephone: (707) 252-7122
Facsimile: (707) 255-6876

Attorneys for Plaintiff
JAM CELLARS, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JaM Cellars, Inc., | CASE NO. |
| Plaintiff, | **COMPLAINT** |
| vs. | 1. **Federal Trademark Infringement** |
| | 2. **Federal Unfair Competition** |
| The Wine Group LLC, | 3. **California Unfair Competition** |
| | 4. **California False or Misleading** |
| Defendant. | **Statements** |
| | 5. **Common Law Trademark** |
| | **Infringement** |
| | 6. **Common Law Unfair Competition** |
| | **DEMAND FOR JURY TRIAL** |

Plaintiff, JaM Cellars, Inc. ("JaM" or "Plaintiff"), for its complaint against Defendant,

The Wine Group LLC ("TWG" or "Defendant"), alleges as follows:

## NATURE OF ACTION

1. This is an action to redress violations of the federal Lanham Act for infringement of a
federally registered trademark (15 U.S.C. §1114), federal unfair competition (15 U.S.C.
§1125(a)), California unfair competition (Cal. Bus. & Prof. Code §17200), the
dissemination of false and misleading statements (Cal. Bus. & Prof. Code §17500) and
common law trademark infringement and unfair competition, as the result of willful and
unauthorized use by Defendant of colorable imitations of Plaintiff's trademark, as more

COMPLAINT; DEMAND                                          1
FOR JURY TRIAL

1  fully set forth hereinafter.  Plaintiff seeks preliminary and permanent injunctive relief

2  restraining Defendant's infringement of Plaintiff's trademark, monetary damages,

3  attorneys' fees and related relief.

4  ### THE PARTIES

5  2.  Plaintiff, JaM Cellars, Inc., is a California corporation with its corporate offices located

6  at 1085 Thompson Street, Napa, California 94558.

7  3.  Upon information and belief, Defendant, The Wine Group LLC, is a Delaware limited

8  liability company with its corporate offices located at 4590 Tesla Road, Livermore,

9  California 94550.

10  ### JURISDICTION AND VENUE

11  4.  This Court has subject matter jurisdiction over Plaintiff's claim under and pursuant to

12  15 U.S.C. §1121 and 28 U.S.C. §1338(a), as the claims arise under the federal Lanham

13  Act, 15 U.S.C. §§1116-1127.  This Court also has pendent jurisdiction over all related

14  claims herein in accordance with 28 U.S.C. §1338(b).

15  5.  Upon information and belief, Defendant, either directly or through its agents, transacted

16  business in the State of California and within this judicial district, as more specifically

17  set forth below, and expected or should reasonably have expected its acts to have

18  consequence in the State of California and within this judicial district.

19  6.  Venue is proper in this district pursuant to 28 U.S.C. §1391(b), as Defendant is doing

20  business in this judicial district and therefore may be found in this district, and/or as a

21  substantial part of the events giving rise to the claims alleged herein occurred in this

22  judicial district, and/or the infringement occurred in this judicial district.

23  ### INTRADISTRICT ASSIGNMENT

24  7.  Pursuant to Civil Local Rule 3-2(c) this is an intellectual property matter which is to be

25  assigned on a district-wide basis.

26  ### ALLEGATIONS COMMON TO ALL CLAIMS

27  8.  Plaintiff is the owner of the trademark BUTTER for wine as well as the owner of

28  incontestable U.S. Trademark Registration No. 3,999,253 for BUTTER for wine in

COMPLAINT; DEMAND                    2
FOR JURY TRIAL

DICKENSON PEATMAN & FOGARTY

JAM000429

1     International Class 33, issued on July 19, 2011 with constructive rights dating back to

2     April 11, 2010 (the "BUTTER Mark"). Plaintiff has used the BUTTER mark on and in

3     association with wine since as early as 2010, long prior to the acts of Defendant

4     complained of herein.

5     9. Plaintiff's BUTTER Mark for wine is not descriptive when used in association with

6     wine and therefore is inherently distinctive.

7     10. Plaintiff produces a California Chardonnay wine under the BUTTER Mark. BUTTER

8     wine is offered for sale in forty-eight (48) states, including the state of California.

9     Since, 2010, Plaintiff has sold over six million (6,000,000) bottles of BUTTER wine

10     nationwide. In 2016 alone, Plaintiff sold over three million (3,000,000) bottles of

11     BUTTER wine.

12     11. Since 2010, Plaintiff's dollar sales of its BUTTER wine have been in excess of fifty-

13     three million dollars ($53,000,000). In 2016, Plaintiff's sales of its BUTTER wine

14     were in excess of twenty-six million dollars ($26,000,000).

15     12. In 2016, Plaintiff produced over ten million (10,000,000) bottles of BUTTER wine with

16     a retail value of over one hundred fifty million dollars ($150,000,000).

17     13. According to Nielsen U.S. Food/Drug/Liquor 52 weeks report ending December 2016,

18     Plaintiff's BUTTER wine is the #2 selling Chardonnay in the United States.

19     14. Since 2010, Plaintiff has expended well over two million dollars ($2,000,000) in

20     advertising and marketing its BUTTER wine, including direct marketing, promotions,

21     sponsorships, wine tastings, catalog and print advertisements, website production, and

22     point of sale materials.

23     15. In 2015 and 2016, Plaintiff was a primary sponsor of the BottleRock Napa Valley

24     music festival where the BUTTER brand was prominently featured and seen,

25     collectively, by over two hundred thousand (200,000) festival goers.

26     16. Plaintiff's BUTTER wine received an 87 point score in the *Wine Spectator* for its 2011

27     vintage, was awarded a silver medal at the 2016 San Francisco Chronicle International

28     Wine Competition, received a #1 ranking from wine professionals in the Judgment of

COMPLAINT; DEMAND           3
FOR JURY TRIAL.

DICKENSON PEATMAN & FOGARTY

JAM000430

1     Oakland at the 2016 Oakland Wine Festival, and was recognized by Impact Magazine

2     as a 2016 "Impact Hot Brand Award Winner."

3    17. As evidenced by Plaintiff's sales and accolades for the BUTTER wine, Plaintiff owns

4      extremely valuable goodwill in its BUTTER Mark and the mark has extraordinary

5      financial value.

6    18. As a result of the wide, continuous advertising and distribution of Plaintiff's BUTTER

7      wine since as early as 2010, the BUTTER Mark has also acquired distinctiveness

8      among wine consumers.

9    19. In late December 2016, Plaintiff learned that a Certificate of Label Approval ("COLA")

10     was issued by the U.S. Alcohol and Tobacco Tax and Trade Bureau ("TTB") to TWG

11     on December 14, 2016 for a Chardonnay wine produced from California grapes

12     featuring the mark BUTTERKISSED (COLA TTB ID No. 16344001000430).  The

13     issuance of a COLA by the TTB is a legal prerequisite for the release of a wine into

14     U.S. commerce.

15    20. As a result of learning of the COLA for the BUTTERKISSED label, in early January

16     2017, counsel for JaM called counsel for TWG to inquire as to the BUTTERKISSED

17     label.  During such conversation, counsel for JaM advised counsel for TWG that JaM

18     objected to the BUTTERKISSED mark and inquired as to TWG's intent in proceeding

19     with the label. Counsel for JaM further advised that if TWG proceeded with use of the

20     BUTTERKISSED label JaM would bring a trademark infringement action against

21     TWG. Counsel for TWG advised that TWG was not ready to roll out its

22     BUTTERKISSED wine and that she would reach out to JaM's counsel before such roll

23     out should TWG proceed with the brand.

24    21. During the week of April 17, 2017, JaM was attending a meeting of the Wine and

25     Spirits Wholesalers of America when JaM was informed by a distributor that TWG had

26     rolled out its BUTTERKISSED wine.

27    22. Upon information and belief, TWG's BUTTERKISSED mark was first used in

28     commerce on March 6, 2017.

COMPLAINT; DEMAND             4
FOR JURY TRIAL

JAM000431

23. On April 24, 2017, counsel for JaM contacted counsel for TWG to inquire as to TWG's use of the BUTTERKISSED mark in commerce. TWG's counsel indicated that she had been meaning to call JaM's counsel but had forgotten to do so and confirmed that TWG's BUTTERKISSED wine had already been rolled out.

24. Upon information and belief, TWG adopted the BUTTERKISSED mark to capitalize upon the great success of the BUTTER brand and to unfairly compete with the BUTTER brand by misleading consumers as to the origin of the BUTTERKISSED brand.

25. Upon information and belief, Defendant has used the BUTTERKISSED mark in commerce.

26. Defendant's adoption and/or use of the BUTTERKISSED mark in commerce is subsequent to Plaintiff's adoption, use and registration of its BUTTER Mark.

27. Defendant's BUTTERKISSED mark is confusingly similar to Plaintiff's BUTTER Mark, given that the marks are similar in sight and sound, start with the same dominant term "BUTTER," utilize the same color combination on the labeling (i.e., yellow and black) and are used on the identical goods, namely, Chardonnay wine produced from California grapes.

28. Use of the BUTTERKISSED mark by Defendant is likely to confuse consumers into believing that Defendant's BUTTERKISSED wine is affiliated with, associated with, connected to, or sponsored by Plaintiff and its popular BUTTER wine, and Defendant will unjustly benefit from such association.

29. Defendant's infringing use of the mark BUTTERKISSED will unjustly increase the profitability of Defendant's BUTTERKISSED brand to the detriment of Plaintiff and at no cost to Defendant.

30. Plaintiff will be further harmed as consumers will purchase the BUTTERKISSED wine believing it to be the BUTTER wine or to be affiliated with, associated with, connected to, or sponsored by Plaintiff, and thereby forego purchase of the BUTTER wine, resulting in loss of sales to Plaintiff from Defendant's unfair competition.

COMPLAINT; DEMAND
FOR JURY TRIAL                                    5

JAM000432

DICKENSON PEATMAN & FOGARTY

31. Defendant's infringing use of the confusingly similar BUTTERKISSED mark will financially harm Plaintiff by diminishing the value of Plaintiff's BUTTER Mark.

32. Defendant's use of the BUTTERKISSED mark will also diminish the value of Plaintiff's BUTTER Mark and endanger the ability of Plaintiff's BUTTER Mark to serve as a unique and distinctive source indicator for Plaintiff and/or Plaintiff's goods.

33. Unless restrained by this Court, Defendant will unfairly compete with Plaintiff by using the BUTTERKISSED mark, wherefore Plaintiff is without adequate remedy at law.

34. This case is an exceptional case entitling Plaintiff to treble damages and attorneys' fees, and Defendant's conduct further entitles Plaintiff to punitive damages.

**FIRST CAUSE OF ACTION**

(Federal Trademark Infringement under 15 U.S.C. §1114)

35. Defendant's above-averred actions constitute use in commerce of a reproduction, counterfeit, copy or colorable imitation of Plaintiff's registered mark in connection with the sale, offering for sale, distribution or advertising of goods or services on or in connection with which such use is likely to cause consumer confusion, deception or mistake as to source, sponsorship or approval of the Defendant's aforesaid goods or services in violation of 15 U.S.C. §1114.

**SECOND CAUSE OF ACTION**

(Federal Unfair Competition under 15 U.S.C. §1125(a))

36. The Defendant's above-averred actions constitute use in commerce of a word, name or device and false designation of origin which is likely to cause confusion, or to cause mistake, or to deceive as to affiliation, connection or association of Defendant with Plaintiff or as to the origin, sponsorship or approval of the goods offered in connection therewith in violation of 15 U.S.C. §1125(a).

///

///

///

///

COMPLAINT; DEMAND
FOR JURY TRIAL

6

1

### THIRD CAUSE OF ACTION

2

(State Unfair Competition under Cal. Bus. & Prof. Code §17200)

3   37. The Defendant's above-averred actions related to use of the BUTTERKISSED mark in

4   commerce constitute unlawful, unfair or fraudulent business acts or practices in

5   violation of Cal. Bus. & Prof. Code §17200.

6

### FOURTH CAUSE OF ACTION

7

(False or Misleading Statements under Cal. Bus. & Prof. Code §17500)

8   38. The Defendant's above-averred actions related to use of the BUTTERKISSED mark in

9   commerce constitute the dissemination and making of untrue or misleading statements,

10   which by the exercise of reasonable care should have been known to be false or

11   misleading, in violation of Cal. Bus. & Prof. Code §17500.

12

### FIFTH CAUSE OF ACTION

13

(Common Law Trademark Infringement)

14   39. The Defendant's above-averred actions related to use of the BUTTERKISSED mark in

15   commerce constitute trademark infringement and passing off in violation of the

16   common law of California.

17

### SIXTH CAUSE OF ACTION

18

(Common Law Unfair Competition)

19   40. The Defendant's above-averred actions related to use of the BUTTERKISSED mark in

20   commerce constitute a false designation of origin in violation of the common law of

21   California.

22

23

### PRAYER FOR RELIEF

24

25   WHEREFORE, Plaintiff requests that judgment be entered as follows:

26   1.   That Defendant, its principals, partners, franchisees, agents, employees, licensees,

27   affiliates, distributors, producers, any parent and subsidiary companies, attorneys

28   and representatives and all of those in privity with or acting under its direction

COMPLAINT; DEMAND                    7
FOR JURY TRIAL

DICKENSON PEATMAN & FOGARTY

JAM000434

1    and/or pursuant to its control, be preliminarily and permanently enjoined and

2    restrained, from directly or indirectly:

3        a.    Using the mark BUTTERKISSED, or any term or mark confusingly similar

4            to the BUTTER Mark, in connection with the advertisement, promotion,

5            distribution, offering for sale or selling of alcohol beverages, or products or

6            services related to alcohol beverages;

7        b.    Performing any acts or using any trademarks, names, words, images or

8            phrases that are likely to cause confusion, to cause mistake, to deceive or

9            otherwise mislead the trade or public into believing that Plaintiff and

10           Defendant are one in the same or are in some way connected or that Plaintiff

11           is a sponsor of Defendant or that the goods of Defendant originate with

12           Plaintiff or are likely to lead the trade or public to associate Defendant with

13           Plaintiff;

14   2.    That Defendant be required to file with the Court, and serve on Plaintiff, a

15       statement under oath evidencing compliance with any preliminary or permanent

16       injunctive relief ordered by the Court within fourteen (14) days after the entry of

17       such order of injunctive relief;

18   3.    That Defendant, its principals, partners, franchisees, agents, employees, licensees,

19       affiliates, distributors, producers, any parent and subsidiary companies, attorneys

20       and representatives and all of those in privity with or acting under its direction

21       and/or pursuant to its control, be required to deliver up for destruction all

22       advertising, promotional materials, point of sale materials, labels, caps, corks,

23       neckers, packaging, and any other materials bearing the infringing mark together

24       with all artwork, plates, molds, matrices and other means and materials for making

25       and reproducing the same;

26   4.    That Defendant be ordered to recall infringing BUTTERKISSED wine in the

27       marketplace from retailers;

28   ///

COMPLAINT; DEMAND          8
FOR JURY TRIAL

DICKENSON PEATMAN & FOGARTY

JAM000435

1     5.   That Defendant be ordered to pay Plaintiff monetary damages for the harm resulting

2          from infringement of Plaintiff's mark, in an amount to be determined at trial;

3     6.   That Plaintiff's damages be trebled and that Defendant be order to pay Plaintiff's

4          attorneys' fees on the basis that this is an exceptional case;

5     7.   That Plaintiff be awarded punitive damages as a result of Defendant's conduct;

6     8.   That Plaintiff have such other and further relief as this Court shall deem just and

7          proper on the merits.

8

9  Dated: April 25, 2017

10

11                             Respectfully submitted,

12                             DICKENSON, PEATMAN & FOGARTY

13                             By

14                                J. Scott Gerien

                                 Joy L. Durand

15                                 1455 First Street, Suite 301

16                                 Napa, California 94559

                                Telephone: 707-252-7122

17                                 Facsimile: 707-255-6876

18                               Attorneys for Plaintiff,

                                JaM Cellars, Inc.

19

20

21

22

23

24

25

26

27

28

COMPLAINT; DEMAND               9
FOR JURY TRIAL

JAM000436

*DICKENSON PEATMAN & FOGARTY* (vertical sidebar)

1

<u>DEMAND FOR JURY TRIAL</u>

2

3

Plaintiff hereby requests a trial by jury in this matter.

4

5

Dated: April 25, 2017

6

Respectfully submitted,

7

DICKENSON, PEATMAN & FOGARTY

8

9

10

By J. Scott Gerien
Joy L. Durand

11

1455 First Street, Suite 301
Napa, California 94559
Telephone: 707-252-7122
Facsimile: 707-255-6876

12

13

14

Attorneys for Plaintiff,
JaM Cellars, Inc.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT; DEMAND
FOR JURY TRIAL

10

JAM000437

# EXHIBIT O

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT P

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT Q

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT R

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT S

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT T

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT U

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT V

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT W

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT X

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT Y

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT Z

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT AA

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT BB

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT CC

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION



PLAINTIFF'S EXHIBIT NO. 23
WITNESS: Dubiel
DATE: 12-4-19
Diane L. Freeman, CSR 5884



PLAINTIFF'S EXHIBIT NO. 24
WITNESS: Dubiek
DATE: 12-4-19
Diane L. Freeman, CSR 5884



PLAINTIFF'S EXHIBIT NO. 25
WITNESS: Dubiel
DATE: 12-4-19
Diane L. Freeman, CSR 5884



PLAINTIFF'S EXHIBIT NO. 26
WITNESS: Dubiel
DATE: 12-4-19
Diane L. Freeman, CSR 5884



PLAINTIFF'S EXHIBIT NO. 27
WITNESS: Dubiel
DATE: 12-4-19
Diane L. Freeman, CSR 5884

# EXHIBIT DD

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT EE

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT FF

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT GG

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT HH

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT II

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

ResearchGate

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/330666496

# The visual ecology of product packaging and its effects on consumer attention

**Article** *in* Journal of Business Research · January 2019

DOI: 10.1016/j.jbusres.2019.01.043

CITATIONS
6

READS
598



5 authors, including:

Jacob L. Orquin
Aarhus University
**31** PUBLICATIONS   **816** CITATIONS

SEE PROFILE

Martin Petri Bagger
Aarhus University
**2** PUBLICATIONS   **40** CITATIONS

SEE PROFILE

Erik Stoltenberg Lahm
Aarhus University
**1** PUBLICATION   **6** CITATIONS

SEE PROFILE

Klaus G Grunert
Aarhus University
**438** PUBLICATIONS   **14,757** CITATIONS

SEE PROFILE

Some of the authors of this publication are also working on these related projects:

Eating habits and satisfaction with life in Chilean university students View project

Food in Later Life View project

All content following this page was uploaded by Jacob L. Orquin on 27 January 2019.

The user has requested enhancement of the downloaded file.

The visual ecology of product packaging and its effects on consumer attention

*Journal of Business Research*

Jacob L. Orquin

Aarhus University and Reykjavik University

Martin P. Bagger, Erik S. Lahm, Klaus G. Grunert

Aarhus University

Joachim Scholderer

Norwegian University of Life Sciences, University of Zurich and Aarhus University

Author note

For correspondence concerning this article please contact Jacob Lund Orquin, Department of Management/MAPP, Aarhus University, jalo@mgmt.au.dk. This research was supported in part by the Danish Council for Strategic Research under grant 2101-09-044, ''Bridging the gap between health motivation and food choice behaviour: A cognitive approach'' (HEALTHCOG) and the Danish Ministry of Food, Agriculture and Fisheries and is a part of the "Contract between Aarhus University and Ministry of Food, Agriculture and Fisheries for the provision of research-based policy advice, etc., at Aarhus University, DCA—Danish Centre for Food and Agriculture, 2013–2016". Data is available via the Open Science Framework: https://osf.io/sbym5/

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

**Abstract**

Visual ecology is the study of how different species perceive their visual surroundings. We introduce the concept to consumer research and show that the micro-ecology of product packaging has a predictable visual ecology. Analyzing images of 158 consumer products, we show that brand-related packaging elements are visually conspicuous in terms of visual salience, surface size, and distance to center, while elements related to credence characteristics like sustainability and nutrition are visually inconspicuous. We show that the visual ecology of product packaging is a strong driver of consumer attention independently of consumer goals. Our findings suggest that the reason consumers regularly ignore sustainability and nutrition information is not lack of motivation, but because their visual environment acts as a barrier to attending this information. We conclude with a prediction for consumer attention given a policy intervention to increase the conspicuity of sustainability and nutrition information.

*Keywords*: consumer attention, eye movements, bottom-up control, top-down control, visual ecology

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

The visual ecology of product packaging and its effects on consumer attention

The human visual system has developed over eons to respond to particular features in our visual environment. A forager, for instance, takes advantage of this ability to detect ripe fruit in a crowded foliage because the fruit has a different color than the foliage (Hiramatsu et al., 2008). Our visual system is tuned to detect the color difference between red fruit and green foliage and directs our eyes to objects that stand out from the crowd. Other species respond to other features in their environment—from bees that see ultraviolet to dogs that see black and white (Land & Nilsson, 2012). The type and structure of the visual features animals respond to is termed their visual ecology (Cronin, Johnsen, Marshall, & Warrant, 2014). Each species has abilities according to their needs. Like the forager, consumers can take advantage of their visual abilities to detect differently colored objects in their environment, from car lights to traffic signs or promotion signs in the supermarket (Wedel & Pieters, 2008). What is different about consumers is that they navigate a visual environment designed by others to attract or distract their attention. The visual ecology of consumers is, in other words, a product of culture. This begs the question then, of what features in the visual environment consumers respond to and what is the structure and distribution of these features?

In this article, we address these questions in the context of product packaging. We begin by introducing known characteristics of the human visual system and discuss features in the environment that are likely to attract consumer attention. In the first of two studies, we examine the structure of these features in the context of product packaging. We find that within each product, packaging elements have highly predictable visual features. Packaging elements that are closely related to the brand are generally more visually conspicuous, while elements related to credence characteristics as sustainability and nutrition, which are not necessarily part of the brand positioning but have been added because such information is regarded as socially desirable, are less conspicuous in terms of color, size, and position. We show that these differences influence consumer attention to specific packaging elements. In the second study, we address some limiting conditions of the first study and show that the visual ecology of consumers exerts a strong influence on attention independently of consumer goals. We conclude with predictions of how a change in the conspicuity of packaging elements, due to brand repositioning or due to a policy intervention, might influence consumer attention.

3

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

**Features that attract attention**

A great deal is known about the human visual system and what features in the visual ecology we respond to. These ecological features are commonly referred to as bottom-up factors, and previous research has identified several such factors that influence attention. The most researched and canonical bottom-up factor is visual salience (salience for short). The concept captures the color differences discussed above, but also extends to other features such as the orientation and contrast of objects relative to their surroundings. Salience can be loosely defined as the conspicuity of a visual object relative to its surroundings. Several models of salience have been proposed based on different aspects of visual conspicuity such as contrast, color, edge orientation, or motion (Borji & Itti, 2013; Itti & Koch, 2001). Salience models take any visual scene as input layer and output a topographical salience map of the most conspicuous locations in the scene, i.e., those locations that are brighter, have sharper edges, or different colors than their surroundings. The salience map predicts the order and likelihood of each location in the map being looked at, with the most salient areas being the most likely to be looked at. Several studies have shown that salience maps can predict attention in tasks such as scene viewing (Foulsham & Underwood, 2008; Parkhurst, Law, & Niebur, 2002), visual search (Rutishauser & Koch, 2007), decision-making (Orquin & Lagerkvist, 2015; Towal, Mormann, & Koch, 2013), and consumer behavior (Lohse, 1997; Milosavljevic, Navalpakkam, Koch, & Rangel, 2012; Navalpakkam, Kumar, Li, & Sivakumar, 2012).

A second bottom-up factor is the relative surface size of objects, which has been shown to exert a robust effect on consumer attention (for a review see Peschel & Orquin, 2013). This effect is probably due to the object being more likely to attract attention by chance, but also to psychophysical properties of the visual system (Dehaene, 2003) since increasingly larger objects exhibit a diminishing marginal effect on attention (Lohse, 1997). Surface size effects have been shown in different consumer situations, for instance, are products with more shelf facings (Chandon, Hutchinson, Bradlow, & Young, 2009; Gidlöf, Anikin, Lingonblad, & Wallin, 2017), larger ads (Lohse, 1997), and larger elements within ads (Pieters, Warlop, & Wedel, 2002; Pieters & Wedel, 2004) more likely to be looked at.

A third bottom-up factor is object position. Position effects have been shown both in one and two dimensions. When information is structured in a one-dimensional arrays such as rows or columns, consumers typically read columns of information from top to bottom (Chen, 2010; Sütterlin, Brunner, & Opwis, 2008) and rows of information from left to right (Navalpakkam et al., 2012). This, of course, only holds in societies where the reading direction is from left to right. The

4

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

position of an object not only influences when it is looked at, but also the likelihood of it being looked at. Many consumers ignore a large part of the available information and consequently, objects at the top or to the left are more likely to be seen. In two-dimensional arrays, consumers typically look at the middle of the array, while the corners often go unnoticed (Atalay, Bodur, & Rasolofoarison, 2012; Clarke & Tatler, 2014; Meißner, Musalem, & Huber, 2016). There is some evidence suggesting that positioning effects in two dimensional arrays depend on the object type, i.e. visual or textual (Otterbring, Shams, Wästlund, & Gustafsson, 2013). Positioning effects are well known in retailing where products in the middle of a shelf are chosen more frequently, presumably because they are seen more often than the products in the corners of the shelf (Chandon et al., 2009; Gidlöf et al., 2017). However, in the context of retailing, position effects may be a mix of both bottom up and top down factors since consumers believe that the more popular products are located in the middle of the shelf (Valenzuela & Raghubir, 2009, 2015) even though this is not the case (Valenzuela, Raghubir, & Mitakakis, 2013). Whether consumers hold similar beliefs about positioning of labels on product packaging remains to be shown.

Besides these bottom-up factors, other less researched factors have been identified. Research shows that the amount of visual complexity or clutter affects the likelihood of consumers looking at an object (Pieters, Wedel, & Batra, 2010; Reutskaja, Nagel, Camerer, & Rangel, 2011). The predictability of object locations has also been shown to affect consumer attention (Orquin, Chrobot, & Grunert, 2017). In this article, we focus on salience, size, and position since these bottom-up factors are well understood and can be operationalized in an unambiguous way.

### Top-down control

So far, we have discussed bottom-up factors as if these were the only factors influencing attention. However, this is not the case. Unlike other species, humans have an excellent capacity for attending to objects that are relevant to their goals and ignore objects that are irrelevant, irrespective of bottom-up factors. Humans can ignore irrelevant objects either based on known locations of the irrelevant object (Orquin et al., 2017) or based on peripheral vision (Wästlund, Shams, & Otterbring, 2018). Such goal-driven attention is commonly referred to as top-down control (Corbetta & Shulman, 2002). Previous research has identified a wide range of top-down factors that influence attention such as goals, task instructions, preferences, decision style, cognitive load, involvement, task complexity and mood (for reviews see Orquin & Mueller Loose, 2013; Orquin, Perkovic, & Grunert, 2018; Wedel & Pieters, 2008). What is important to our discussion is that top-

5

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

down factors have been shown to dominate bottom-up factors. Some studies have shown that top-down control is up to 1.5 times more powerful in guiding consumers' attention compared to bottom-up control (Orquin & Lagerkvist, 2015). Some scholars have suggested that top down control account for 2/3 of attention (Wedel & Pieters, 2006) or even that bottom-up factors such as salience play no role in natural environments and that attention is entirely a matter of top-down control (Tatler, Hayhoe, Land, & Ballard, 2011). If this holds, it could suggest that humans are, unlike other species, free of their visual ecology. For example, price or health-motivated consumers should be capable of ignoring irrelevant but eye-catching advertising in favor of cheap or healthy products, no matter how dull these products may look like. However, the view is difficult to reconcile with the malleability of consumer attention demonstrated in advertising (Wedel & Pieters, 2008), packaging (Peschel, Orquin, & Mueller Loose, 2019), instore (Otterbring, Wästlund, Gustafsson, & Shams, 2014), or online contexts (Menon, Sigurdsson, Larsen, Fagerstrøm, & Foxall, 2016).

### The visual ecology of product packaging

If consumers are free of their visual ecology thanks to top-down control, how then do we explain visual marketing practices? Marketers not only believe in the power of bottom-up factors, they are willing to pay large amounts of money for the right visual marketing mix. A classic example is the higher price for differently colored ads in yellow pages books. The different color makes the ad more salient and more likely to be noticed (Lohse, 1997). In retailing, the shelf placement of products is determined by how much marketers are willing to pay for a central position in the middle of the shelf. More shelf facings, which increase the surface size, also cost more money. Both shelf location and size influence consumer attention and choice and are therefore worth paying for (Chandon et al., 2009). In online marketing, advertisers pay more for sponsored search results closer to the top of the page, which increases the chance of browsers seeing and clicking on the ad (Ghose & Yang, 2009). A similar position effect is also found on restaurant menus where dishes at the top of the menu are chosen more often (Dayan & Bar-Hillel, 2011). Naturally, other factors than bottom up attention may contribute to these examples, for instance, due to a limited cognitive capacity consumers may rely on heuristics about color ads or product positions to simplify the search process. Wästlund and colleagues provide evidence from instore eye tracking studies suggesting that such heuristics play an important role in consumer attention (Wästlund, Otterbring, Gustafsson, & Shams, 2015). The exact balance between bottom up and top

6

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

down control remains an open question in many cases, but it seems plausible that marketers intuitively understand bottom-up factors and that it is worth paying for more salient, larger, and better positioned ads and products. At the very least, those marketers who have followed the marketing literature on these topics should understand these mechanisms (for reviews see Wedel & Pieters, 2006, 2008). It seems plausible then, that marketers use this knowledge when designing large-scale visual environments such as the shelf layout as well as small-scale environments such as product packaging. In the micro-ecology of product packaging, we might expect marketers to prioritize packaging elements, making some more visually conspicuous than others. It would, for instance, be reasonable to prioritize brand-related elements that drive the purchase (Klimchuk & Krasovec, 2012). If marketers converge in their priorities, we would consequently expect the visual ecology of product packaging to display certain predictable characteristics. Most notably, we would expect elements that are central to the positioning of the brand, like the brand name and key brand features, to be more salient, larger, and centrally positioned. In comparison, we would expect packaging elements that are more peripheral to the brand positioning or that have been added because they are viewed as socially desirable, to be less salient, smaller and more peripherally positioned. This would apply for credence characteristics like health and sustainability properties of the product, which have increasingly been added to packages in product categories like food (Fernqvist & Ekelund, 2014).

In this article, we address this issue with the following research questions: (i) does the visual ecology of product packaging have a predictable structure, (ii) does this structure influence consumer attention or are consumers free from their visual ecology thanks to top-down control, and (iii) what would happen if we changed the structure of the visual ecology according to a policy intervention?

## Study 1

In Study 1, we use a representative design to examine the visual ecology of product packaging and its effects on consumer attention. We select 158 consumer products from different categories within dairy products and take high-resolution images of each product. We then categorize each packaging element as an area of interest (AOI) and measure each AOI on the three bottom-up factors discussed above: its relative visual salience, its surface size, and its distance to the center of the product. We then conduct an eye-tracking study mimicking a shopping trip, in which participants make choices from different product categories. In each category, participants first see

7

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

an overview of the available products and then evaluate each product individually before making their decision.

**Method**

**Participants.** We recruited a representative sample of 123 Danish consumers (35.77 % men), age ranging from 21 to 59 ($M = 37.85$, $SD = 11.61$). We excluded participants who were not responsible for household shopping or who had a professional background in marketing or the food industry. From the total sample, we excluded 32 participants from the analysis due to low data sampling and the final sample included 91 participants. Participants had normal or corrected-to-normal vision and signed a consent form before beginning the study.

**Materials and measures.** The stimuli consisted of product images taken in a photo laboratory using a high-resolution digital camera. Each product was photographed from all four sides. The total stimulus sample contained 158 products from twelve different dairy product categories. We chose dairy products because it is a broad category (e.g. milk, butter, cheese, yoghurt etc.) and all products in the category are packaged. The study was based on four- and six-alternative choices. The study used an incomplete randomized block design with 24 versions. Each product was shown three times within the 24 versions. All products were grouped into choice sets of four or six products within the same category of foods, and each version consisted of five choice sets. For a complete description of the experimental versions and blocks see Supplementary Information 1. For each product, we defined eight areas of interest (AOIs) located on the front-of-pack (brand, category, fat percentage, organic label, Keyhole label, Guideline Daily Amount label, picture, logo). The organic label is a Danish sustainability/production method label (Ministry of Food, 2015) and the Keyhole (Ministry of Food, 2013) and Guideline Daily Amount (GDA) (Boztuğ, Juhl, Elshiewy, & Jensen, 2015) labels are nutrition labels. We defined the AOIs using Tobii Studio software with zero AOI margins in order to avoid assigning false positive fixations (Orquin, Ashby, & Clarke, 2016). We recorded eye movements using a Tobii 2150 eye-tracker (21 inches, 50 frames per sec) with accuracy = .5° and precision = .35°. For each AOI on each product, we measured the surface size of the AOI, its distance to the center of the product, and its visual salience. We extracted surface size information using the Tobii Studio software, which provides relative surface size measures and we measured distance from center as the Euclidean distance between the center of the product and the center of the AOI. We computed the visual salience of AOIs using a Matlab implementation of the Itti-Koch algorithm (Itti & Koch, 2001). The algorithm processes an input image at the pixel level based on color, contrast, and orientation, and outputs a ranking of the most

8

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

salient locations in the image. The algorithm predicts that the highest ranked and hence most salient location is fixated first followed by the second highest ranked location etc. We transformed the salience ranks assigned to each AOI into a variable ranging from zero to one, where zero was the lowest visual salience and one was the highest visual salience. To ease the interpretation and comparability of the variables in the analyses, we range-standardized surface size and distance to center to a range between zero and one.

**Procedure.** We received participants individually in the laboratory and after completing the consent form, we seated them in front of the eye-tracker and assigned them randomly to one of the 24 experimental versions. Participants were not placed in a chin rest, but were instructed to minimize head movements. After calibration, participants completed two practice trials in which they were required to select their preferred product from a choice set of either four or six products. The practice trials used a different product category than the critical trials. After the practice trials, participants completed the critical trials which consisted of five choice sets from the twelve product categories. The critical trials followed a three-step protocol: overview, evaluation, and choice. In the overview phase, participants were presented with an image of the complete choice set to get an overview of all products. In the evaluation phase, participants had the possibility to inspect each product in detail. Participants could turn products on the screen to see the sides and the back of the product or skip products, using the keyboard. In the choice phase, participants were shown the same image as in the overview phase and were asked to choose their preferred product using the mouse (for an overview of the experiment phases see SI 2).

**Results**

**Analysis of the visual ecology**. We begin by analyzing the structure of the visual ecology of product packaging. We use the packaging element (categorical) to predict salience (metric), size (metric), and distance to center (metric) using generalized linear mixed models (GLMM). All models were estimated using the lme4 package in R. We fit models with and without packaging element as the independent variable using a step-up approach based on BIC. The packaging element was retained as a predictor for both salience, $F(7, 570) = 40.99$, $p < .001$, BIC = 412.58, size, $F(7, 501) = 94.37$, $p < .001$, BIC = 1048.25, and distance to center, $F(7, 480) = 30.47$, $p < .001$, BIC = 156.85. All models had a random intercept grouped by product. To better understand the structure of the environment, we illustrate the distribution of packaging elements in Figure 1 with box plots.

THE VISUAL ECOLOGY OF PRODUCT PACKAGING



**Figure 1.** Box plot of the distribution of salience, size, and distance to center for each packaging element (578 data points). 'GDA' is a nutrition information label widely used in Europe. 'Keyhole' is a government-endorsed health symbol used on food products in the Nordic countries. The x-axis shows the range-standardized scores for salience, surface size, and distance respectively.

**Analysis of fixation likelihood**. We analyze the likelihood of participants fixating a packaging element during the product evaluwith a similar approach as above. The dependent variable (fixation selection) is a binary variable with the value one if an AOI is fixated and zero otherwise. The independent variables are packaging element size (metric), salience (metric), and distance to center (metric). The final model includes main effects of all variables and random intercepts grouped by participant, choice set, product, and packaging element. Table 1 shows the parameter and variance estimates for the final model.

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

Table 1. Parameter and variance estimates for fixation likelihood analysis in Study 1.

| Parameter | Estimate | SE | $z$ | $p$ |
|---|---|---|---|---|
| Intercept | 0.353 | 0.284 | 1.241 | .214 |
| Surface size | 3.353 | 0.333 | 10.070 | <.001 |
| Distance | -2.512 | 0.133 | -18.879 | <.001 |
| Salience | 0.417 | 0.077 | 5.395 | <.001 |

Number of observations = 9918

BIC = 10864.4

Variance (participant) = 0.380

Variance (choice set) = 0.068

Variance (product) = 0.308

Variance (packaging element) = 0.500

The analysis shows that the effects of salience, surface size, and distance to center are in the expected direction. More salient, larger, and more centrally positioned packaging elements are more likely to be fixated. Because the factors are additive, we compute a predicted fixation likelihood for each packaging element based on its average salience, size, and distance. We illustrate the predicted fixation likelihood against the observed fixation likelihood in Figure 2 together with a summary figure of the structure of the visual ecology.

11

THE VISUAL ECOLOGY OF PRODUCT PACKAGING



**Figure 2**. On the left, an illustration of the salience, surface size, and distance to center for each packaging element (578 data points). The salience, surface size, and distance to the center in the figure correspond to the average values for the eight packaging elements. The angular position of packaging elements is arbitrary. On the right, an illustration of the predicted vs. observed fixation likelihood based on the combined effects of salience, surface size, and distance to center for each packaging element (9,926 data points).

## Discussion

Study 1 shows that the visual ecology of product packaging has a predictable structure. Packaging elements central to the brand positioning such as the logo, brand, and picture are consistently more salient, larger, and more centrally positioned than packaging elements that relate to socially desirable credence characteristics like health and sustainability. Thus, the Keyhole (a government endorsed health symbol) and organic labels are consistently the least salient, smallest, and least centrally positioned packaging elements. We also show that this ecological structure plays a large role in determining consumer attention. All three bottom-up factors—salience, size, and distance to center—influence the probability of consumers fixating a product packaging element. The combined effects of the bottom-up factors explain consumer attention well, but Figure 1 suggests that there are additional factors that contribute to consumer attention. Specifically, the brand, category, and Keyhole label all deviate from the predicted level of attention shown as the dotted line. This is most likely due to top-down processes, such as consumers perceiving the brand and category as important and the Keyhole label as unimportant, which could facilitate attention to

12

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

the former and suppress attention to the latter packaging element. Previous research has shown that consumers generally consider the brand as more important and the Keyhole label as less important. Specifically, previous studies have shown that this difference in subjective importance is associated with more attention to the brand and less to the Keyhole label, even when controlling for bottom-up factors such as size and salience (Orquin, Bagger, & Mueller Loose, 2013) or position on the package (Orquin et al., 2017). Two questions arise from this finding. First, is the deviation in attention due to interference from top-down control and second, is it possible, even in the case of interference, to guide consumers to attend the organic and Keyhole labels if these are prioritized in terms of salience, size, and distance to center? In Study 2, we examine the interaction of top-down and bottom-up processes more directly and whether it is possible to increase attention to functionally related packaging elements by enhancing their salience, size, and distance to center.

## Study 2

Based on Study 1, we know that the visual ecology operationalized in terms of salience, size, and distance to center of packaging elements play a large role in determining how much attention a packaging element receives. The study also suggests that top-down factors, such as the perceived importance of packaging elements, may interfere with these bottom-up factors. An important question is therefore to what extent top-down control interferes with bottom-up control. Research on eye movement control processes is divided with regard to whether top-down control interferes with bottom-up control (Nordfang, Dyrholm, & Bundesen, 2013; Orquin & Lagerkvist, 2015; Tatler et al., 2011) which makes it difficult to make specific predictions. If top-down control processes interfere with bottom-up processes, this could attenuate the effects of salience, surface size, and distance to center under high top-down control due to, for instance, a ceiling or floor effect. Alternatively, top-down and bottom-up control could interact to facilitate the effects of bottom-up control (Bagger, 2016). In Study 2, we examine this question by manipulating the same bottom-up factors, salience, size, and distance to center of packaging elements and, a top-down factor, consumer health motivation, in a full-factorial experimental design. The three bottom-up factors are defined operationally as in Study 1 and the top-down factor is manipulated in three conditions: a control condition where participants are instructed to choose their preferred product, a health goal condition in which participants are instructed to choose the healthiest product, and a health priming condition in which participants are exposed to health information and instructed to choose their preferred product. Participants make choices between two toast bread products with a varying

13

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

number of packaging elements, some of which are health-relevant (target labels) and some which are not (distractor labels). We use toast bread due to its ambiguous healthiness. If top-down control interferes with bottom-up control, we would expect either an attenuation or facilitation of salience, size, and distance to center under high top-down control, i.e. higher top-down interference in the health goal condition followed by the health priming condition and lastly by the control condition. We also expect participants' choices to conform to the top-down condition so that higher health motivation leads to more choices in favor of healthier products.

**Method**

    **Stimulus development**. In order to generate target and distractor labels, we conduct a stimulus development study to identify labels relevant for forming health judgments of food products. The study uses a within-subjects design, in which participants assess whether a product with a given label is healthier than a product without that particular label ($N = 225$, $M_{age} = 45.58$, $SD_{age} = 15.60$, 52% females). Responses are binary with a value of zero indicating that the product is considered healthier and a value of one indicating that the product is not considered healthier with that label. Labels are presented individually and participants judge 39 labels in total. We compute mean judgments by averaging participants' health judgments with a score of zero indicating perfect agreement that a label implies healthiness and a score of one that it does not imply healthiness. We classify labels with a mean score < .4 as targets, and labels with a mean score > .7 as distractors. We exclude two labels with mean scores in the interval [.4 - .7] due to their ambiguity. Consequently, we identify four target and 33 distractor labels.

    **Participants**. We recruit 76 participants with the help of a market research company ($M_{age} = 44.84$, $SD_{age} = 13.25$, 34% female). We exclude four participants due to imperfect vision, eye-tracker calibration problems, or being intoxicated. The final sample consists of 72 participants. Participants have normal or corrected to normal vision and provide informed consent before participating in the study.

    **Experimental design**. We conduct a two-alternative choice experiment with a full factorial mixed within-between subjects design manipulating health motivation (control, health goal, and health priming) as a between-subjects factor, and target label salience (high, low), target label surface size (small, large), and target label distance to center (ranging from 463.42 to 208.22 pixels) as within-subjects factors. The position of target and distractor labels on each product is randomly sampled from 15 possible locations. The random positions ensure that participants have to actively

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

search and fixate on labels rather than rely on peripheral vision which has been shown to play a large role in consumer behavior (Wästlund et al., 2018). Target labels are assigned as follows: A target product is chosen with an equal probability between the left and the right side. A target label is then drawn from the set of four target labels with the following probabilities $P = (.8, .07, .07, .07)$. The target label with the highest validity in terms of healthiness is drawn with a probability of .8. To avoid that participants search for a single target, there is a .2 probability of the target not discriminating, i.e. being present on both products. In the event of the target not discriminating, a new target is drawn from the remaining set of targets and assigned to the target product. Two brands are then drawn from a set of seven brands and assigned to each product. Distractor labels are drawn from a set of 33 labels. In order to increase the external validity of each choice set, we vary the number of distractor labels presented in each choice set. The number of distractor labels is equal for products in the same choice set (either 2, 4, 6, 8, 10, 12, 14 distractors per product). The total number of labels (set size) per choice set therefore varies between six and 30 labels. All levels are presented twice, resulting in 140 trials.

    **Materials and measures**. To avoid prior preferences influencing the results, the stimuli are images of mock toast bread. Products are presented on the left and right side of the screen. The salience of target labels is manipulated by controlling the contrast (transparency = 0% vs. 60%). The target label size is manipulated by increasing the surface size from $1.5 \times 1.5$ to $3.0 \times 3.0$ degrees of visual angle. All distractors are small ($1.5 \times 1.5$) and have 0% transparency (for an example, see Figure 3). The experimental stimuli are presented using PsychoPy 2 (Peirce, 2009, 2007). We conduct a pre-test to ensure that all labels are readable at a distance of 60 cm from the screen. To prevent participants from foveating more than one label at a time, labels are separated horizontally and vertically by two degrees of visual angle. Eye movements are recorded using a desk-mounted EyeLink 1000 eye tracker with a monocular sampling rate of 1000 Hz and a screen resolution of $1920 \times 1200$ pixels. The screen subtends a visual angle of 46.5 degrees horizontally and 30.1 degrees vertically. Participants use a chinrest at approximately 60 cm viewing distance from the screen. Fixations are detected using a velocity, acceleration and motion-based algorithm (SR Research, 2008; Holmqvist et al., 2011) with velocity, acceleration, and motion thresholds of 30°/sec, 8,000°/sec$^2$, and 0.15° respectively. An area of interest (AOI) is drawn around each label. To avoid false positive fixations, the AOIs are the same size as the object.

    **Procedure**. Upon entering the laboratory, participants are tested for color blindness, visual acuity and eye dominance. Participants failing either the color blindness or the acuity test are

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

excluded from the experiment, but receive full payment for their inconvenience. We randomly assign participants to one of the three top-down conditions and they receive a short questionnaire corresponding to that condition. Participants in the health condition ($N = 26$) and the health priming condition ($N = 26$) receive the same questionnaire, which contain four vignettes concerning the four target labels and eight questions to ensure that participants have read the vignettes. Participants in the control condition ($N = 24$) receive a control questionnaire of similar length about shopping habits. After completing the questionnaire, participants are seated in front of the eye tracker and their head movements are restrained using a chin rest. Participants are calibrated using a 9-point calibration procedure performed at the beginning of the experiment followed by a 9-point drift validation test. A calibration offset < 1 degrees of visual angle is considered acceptable. After the calibration, participants in the health goal condition are instructed to choose the healthier product, while participants in the health priming and control conditions are instructed to choose the product they prefer. To control the location of the first fixation, every trial is preceded by a fixation cross presented at the center of the screen for 2000 ms. Participants complete 140 trials by indicating their choice of either the left or the right product by pressing the left or right arrow key. Trials last as long as participants need to make a choice. To test the validity of target and distractor labels, participants complete a post study questionnaire similar to the one in the stimulus development study.

**Results**

     **Manipulation check**. To ensure the validity of the target and distractor labels we first inspect participants' responses to the post-experimental questionnaire. The results indicate that target labels have a stronger association with healthiness than distractor labels in all conditions. Table 2 shows the means and confidence intervals for targets and distractors in all conditions.

Table 2. Means and confidence intervals for target and distractor labels in the stimulus development and the three experimental conditions.

| Condition | $M_{target}$ | CI 95 | $M_{distractor}$ | CI 95 |
|---|---|---|---|---|
| Stimulus development study | .33 | [.29, .38] | .89 | [.87, .91] |
| Health goal condition | .06 | [.00, .12] | .85 | [.79, .91] |
| Health priming condition | .04 | [.01, .07] | .80 | [.74, .86] |
| Control condition | .08 | [.02, .14] | .80 | [.76, .84] |

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

**Eye movement analysis**. The likelihood of participants fixating target labels is analyzed in a similar way as in Study 1. The dependent variable (fixation selection) is a binary variable with the value one if the target label was fixated and zero otherwise. The independent variables are target label salience (binary), target label size (binary), target label distance to center (metric, 14 levels), set size (metric), and condition (categorical). The final model includes main effects of all variables except condition, and random intercepts grouped by participant and target label type. Table 3 shows the parameter and variance estimates for the final model.

Table 3. Parameter and variance estimates for fixation likelihood analysis in Study 2.

| Parameter | Estimate | SE | $z$ | $p$ |
|---|---|---|---|---|
| Intercept | -0.245 | 0.215 | -1.143 | .253 |
| Size | 1.352 | 0.040 | 33.664 | <.001 |
| Salience | 0.333 | 0.039 | 8.582 | <.001 |
| Distance | -0.445 | 0.055 | -8.037 | <.001 |
| Set size | -0.017 | 0.002 | -7.020 | <.001 |

Number of observations = 14896

BIC = 16299.4

Variance (participant) = 0.380

Variance (target label type) = 0.046

**Choice analysis.** We then analyze the likelihood of participants choosing the target product across conditions. The dependent variable (target choice) is a binary variable indicating whether a participant chose the target product in a given trial. Fixation to the target label (binary) and condition (categorical) are used as independent variables. We use the same model selection approach as in Study 1. The final model includes main effects of fixation to the target label, condition, and an interaction between fixation and condition. The model includes a random intercept grouped by participant and by target label type. Table 3 shows the parameter and variance estimates for the final model. Figure 4 illustrates the effect of condition and fixation of the target label on the probability of choosing the healthier target product.

17

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

Table 4. Parameter estimates for choice likelihood analysis in Study 2.

| Parameter | Estimate | SE | $z$ | $p$ |
|---|---|---|---|---|
| Intercept | 2.041 | 0.236 | 8.630 | <.001 |
| Condition (health goal) | -1.397 | 0.328 | -4.259 | <.001 |
| Condition (health priming) | -0.898 | 0.322 | -2.791 | .005 |
| Fixation | 0.891 | 0.105 | 8.505 | <.001 |
| Condition (health goal) × fixation | -0.591 | 0.128 | -4.632 | <.001 |
| Condition (health primed) × fixation | -0.623 | 0.129 | -4.820 | <.001 |

Number of observations = 14896

BIC = 13990.2

Variance (participant) = 1.22

Variance (target label type) = 0.01



**Figure 3**. The probability of choosing the heathier target product depending on the condition and whether the target label was fixated. Error bars represent 95% confidence intervals (10,640 data points).

    **Follow up analysis**. It is a common concern in consumer research that repeated measures designs create demand or learning effects which result in low external validity. Since Study 2

18

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

contains 140 trials per participant, we test the same model selection procedure on the first 10 trials for both the eye movement and choice data. The first 10 trials are less likely to be influenced by learning effects and therefore indicate whether the results are biased by the repeated measures experimental design. For the eye movement data, the final model for the first 10 trials is similar to the one on the complete data set, although all estimates are slightly larger, $\beta_{size}$ = 1.725, $p < .001$, $\beta_{salience}$ = 0.474, $p < .01$, $\beta_{distance}$ = -0.613, $p = .01$ $\beta_{set\ size}$ = -0.040, $p < .001$. For the choice data the final model for the first 10 trials retains the main effects of condition and fixation, but not their interaction – presumably because 760 are too few observations to adequately fit the interaction term. The estimates for the two main effects fall within the 95% confidence interval of the original estimates, $\beta_{condition\ (health\ goal)}$ = 1.172, $p < .001$, $\beta_{condition\ (health\ priming)}$ = 0.314, $p = .272$, $\beta_{fixation}$ = 0.795, $p < .001$. A model free inspection of trial 1 and trials 1-5 reveal similar data patterns for both eye movement and choice data. The follow up analysis suggests that the repeated measures design does bias the results for the eye movement analysis, but not the choice analysis. For a more externally valid, albeit less precise, estimate of bottom up effects readers may therefore refer to the estimates in the follow up analysis.

**Discussion**

In Study 2, we examine the effects of the same bottom-up factors as in Study 1 (salience, surface size, and distance to center) under different levels of top-down control. We find that all bottom-up factors, including set size, influence fixation likelihood. Regarding top-down factors, we find no effect of health goal or health priming on fixation likelihood, either as main or interaction effects with bottom-up factors. Without the choice results, it would seem that the manipulation of the choice condition was unsuccessful, but the choice data reveal otherwise. The probability of participants choosing the healthier target product is highest in the health goal condition followed by the health priming and finally the control condition. In all three conditions, fixating the target label has a positive effect on choosing the target product. Interestingly, choice accuracy is above chance level in all conditions both when the target label is fixated and when it is not. This might be due to covert (peripheral) attention, i.e., participants fixating a point in proximity to a target allowing for indirect detection of the target (Wästlund et al., 2018). Overall, the results suggest that, in this study, top-down control does not interfere with bottom-up control. This could be due to a generally low level of top-down control. Orquin, Chrobot and Grunert showed that randomizing label positions suppresses top-down control so that participants are less capable of ignoring subjectively

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

irrelevant labels and attending to subjectively relevant labels (Orquin et al., 2017). In this study we randomized label positions to mimic naturalistic packaging, and this might have suppressed the effect of health motivation on fixation likelihood. However, similar findings have been demonstrated in eye tracking studies conducted in supermarkets (Gidlöf et al., 2017). To conclude, our findings suggest that top-down control does not interfere with bottom-up processes to the extent previously assumed (Orquin & Lagerkvist, 2015; Tatler et al., 2011; Wedel & Pieters, 2006). Consumers are therefore not free from their visual ecology, but subject to its particular structure as we saw in Study 1. The influence of bottom-up factors is the basis for visual marketing practices (Wedel & Pieters, 2006, 2008) or it can, as Study 2 shows, be the basis for visually oriented behavioral interventions (Münscher, Vetter, & Scheuerle, 2016).

### Predictions for a different visual ecology

Study 1 and 2 both show that the visual ecology plays an important role in determining consumer attention to product packaging elements. Furthermore, what consumers see influences what they choose. By combining the insights from both studies, it is possible to make predictions about what might happen if policy makers or producers decided to change the visual ecology of product packaging by enhancing the visibility of, for instance, sustainability or nutrition labels. Based on the fixed effect estimates from Study 1, we compute the expected fixation likelihood for the Keyhole label given a one or two standard deviation improvement in salience, surface size, and distance to center. We make the predictions for the Keyhole label because it is a simple behavioral intervention that helps consumers identify healthy foods within a category of food products. Noticing and incorporating the Keyhole label in consumer choices therefore has a great potential for enhancing healthy foods choice. Table 5 summarizes the levels of salience, size, and distance to center and the predicted fixation likelihood. Enhancing all three factors by 2 SD would result in a 42.4% fixation likelihood. One challenge related to enhancing salience, size, and distance to center of a packaging element is that it changes the entire visual micro-ecology of the product. Both salience and size are relative to other elements, and centralizing elements creates a competition with other packaging elements since there is only a limited amount of space in the middle of the product.

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

Table 5. Predictions for consumer attention to the Keyhole label in an enhanced visual ecology.

| Setting | distance | size | salience | fixation likelihood |
|---|---|---|---|---|
| Current situation | 0.746 | 0.012 | 0.264 | 15.7% |
| 1 SD distance | 0.549 | 0.012 | 0.264 | 21.3% |
| 1 SD surface | 0.746 | 0.018 | 0.264 | 17.9% |
| 1 SD salience | 0.746 | 0.012 | 0.627 | 18.0% |
| 1 SD all | 0.549 | 0.018 | 0.627 | 27.1% |
| 2 SD all | 0.352 | 0.023 | 0.991 | 42.4% |

Another challenge related to these predictions is that producers might be concerned about crowding out brand-related packaging elements like the brand, logo or pictures on the product. While it is true that any change to a single packaging element is likely to influence all other elements, producers must keep in mind that brand-related packaging elements, particularly the brand itself, are close to ceiling in terms of consumer attention. Naturally, further studies might reveal how to strike an optimal balance in packaging design that benefits both the producer and the consumer in terms of attention to brand and functionally related elements.

### Discussion

In this article, we have introduced the concept of visual ecology in consumer research. We have raised the question of whether the visual ecology of product packaging contains predictable structures and whether these structures influence consumer attention. In Study 1, we show that the visual ecology of product packaging does have a predictable structure and that packaging elements central to the brand are more conspicuous in terms of salience, size, and distance to center whereas elements referring to socially desirable credence characteristics such as sustainability or nutrition are the least conspicuous. This structure is probably due to marketers converging on the same priorities, namely to visually promote those packaging elements that drive purchases. We also show that the visual ecology explains consumer attention well, although some packaging elements—including the brand, category, and Keyhole label—are relatively over- and under-attended according to the predicted effects of the bottom-up factors. This over- and under-attendance is

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

probably due to interference from top-down factors such as the perceived importance of the packaging element.

In Study 2, we examine the influence of top-down control on the effects of salience, size, and distance to center by manipulating consumer heath goals. Surprisingly, we find that in this study consumer goals do not interfere with the effect of the bottom-up factors on attention. Participants do, however, make different decisions depending on their goals. Participants instructed or primed with health goals are more likely to choose the healthier of the two products. Finally, we combine these insights to predict the effect of a policy intervention. We show that relatively small changes in the visual ecology of product packaging can lead to much higher levels of consumer attention to, for instance, sustainability or nutrition information.

To conclude, our findings show that the visual ecology of product packaging has a predictable structure favoring brand-related elements and that this leads consumers to largely ignore sustainability and nutrition-related elements. We believe that the concept of visual ecology has a lot to offer in consumer research, and with this article we take a first step in this direction. Future studies should extend the scope to other ecological features such as visual clutter and location predictability and address the limitations of the current studies. To examine a sufficiently wide range of products and maintain internal validity, it was necessary to conduct both Study 1 and Study 2 in the laboratory. Studies with mobile eye-tracking would be helpful to generalize the findings to a natural and incentivized environment. Currently such studies remain limited because the data quality of mobile eye-trackers makes it difficult to detect fixations to small objects such as packaging elements (Orquin & Holmqvist, 2017). These limitations introduce uncertainty in the parameter estimates in both studies and we must allow for this uncertainty when interpreting the predictions. Despite the limitations, we believe the studies present a strong case for studying the visual ecology of consumers. Understanding the visual ecology of consumers helps us explain why consumers regularly ignore sustainability and nutrition information (Graham, Orquin, & Visschers, 2012; Grunert, Wills, & Fernández-Celemín, 2010). Rather than blaming consumers for a lack of motivation, it would be more helpful to design policy interventions that address the visual ecology of consumers, for instance by increasing the visual conspicuity of sustainability and nutrition information.

**References**

Atalay, A. S., Bodur, H. O., & Rasolofoarison, D. (2012). Shining in the Center: Central Gaze

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

Cascade Effect on Product Choice. *Journal of Consumer Research*, *39*(4), 848–866. https://doi.org/10.1086/665984

Bagger, M. P. (2016). *Attention and decision-making: separating top-down from bottom-up components*. Aarhus University. Retrieved from http://pure.au.dk/portal/files/104902477/Thesis_Martin_Petri_Bagger.pdf

Borji, A., & Itti, L. (2013). State-of-the-Art in Visual Attention Modeling. *IEEE Transactions on Pattern Analysis and Machine Intelligence*, *35*(1), 185–207. https://doi.org/10.1109/TPAMI.2012.89

Boztuğ, Y., Juhl, H. J., Elshiewy, O., & Jensen, M. B. (2015). Consumer response to monochrome Guideline Daily Amount nutrition labels. *Food Policy*, *53*, 1–8. https://doi.org/10.1016/J.FOODPOL.2015.03.002

Chandon, P., Hutchinson, J. W., Bradlow, E. T., & Young, S. H. (2009). Does In-Store Marketing Work? Effects of the Number and Position of Shelf Facings on Brand Attention and Evaluation at the Point of Purchase. *Journal of Marketing*, *73*(6), 1–17. https://doi.org/10.1509/jmkg.73.6.1

Chen, L. (2010). Eye-tracking study of user behavior in recommender interfaces. *User Modeling, Adaptation, and Personalization*, 375–380. https://doi.org/10.1007/978-3-642-13470-8_35

Clarke, A. D. F., & Tatler, B. W. (2014). Deriving an appropriate baseline for describing fixation behaviour. *Vision Research*, *102*, 41–51. https://doi.org/10.1016/j.visres.2014.06.016

Corbetta, M., & Shulman, G. L. (2002). Control of goal-directed and stimulus-driven attention in the brain. *Nature Reviews Neuroscience*, *3*(3), 215–229. https://doi.org/10.1038/nrn755

Cronin, T. W., Johnsen, S., Marshall, N. J., & Warrant, E. J. (2014). *Visual Ecology*. Princeton University Press.

Dayan, E., & Bar-Hillel, M. (2011). Nudge to nobesity II: Menu positions influence food orders. *Judgment and Decision Making*, *6*(4), 333–342. Retrieved from http://www.sjdm.org/journal/11/11407/jdm11407.pdf

Dehaene, S. (2003). The neural basis of the Weber–Fechner law: a logarithmic mental number line. *Trends in Cognitive Sciences*, *7*(4), 145–147. https://doi.org/10.1016/S1364-6613(03)00055-X

Fernqvist, F., & Ekelund, L. (2014). Credence and the effect on consumer liking of food – A review. *Food Quality and Preference*, *32*, 340–353. https://doi.org/10.1016/J.FOODQUAL.2013.10.005

Foulsham, T., & Underwood, G. (2008). What can saliency models predict about eye movements?

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

Spatial and sequential aspects of fixations during encoding and recognition. *Journal of Vision*, *8*(2), 6. https://doi.org/10.1167/8.2.6

Ghose, A., & Yang, S. (2009). An Empirical Analysis of Search Engine Advertising: Sponsored Search in Electronic Markets. *Management Science*, *55*(10), 1605–1622. https://doi.org/10.1287/mnsc.1090.1054

Gidlöf, K., Anikin, A., Lingonblad, M., & Wallin, A. (2017). Looking is buying. How visual attention and choice are affected by consumer preferences and properties of the supermarket shelf. *Appetite*, *116*, 29–38. https://doi.org/10.1016/j.appet.2017.04.020

Graham, D. J., Orquin, J. L., & Visschers, V. H. M. (2012). Eye tracking and nutrition label use: A review of the literature and recommendations for label enhancement. *Food Policy*, *37*(4), 378–382. https://doi.org/10.1016/j.foodpol.2012.03.004

Grunert, K. G., Wills, J. M., & Fernández-Celemín, L. (2010). Nutrition knowledge, and use and understanding of nutrition information on food labels among consumers in the UK. *Appetite*, *55*(2), 177–189. https://doi.org/10.1016/J.APPET.2010.05.045

Hiramatsu, C., Melin, A. D., Aureli, F., Schaffner, C. M., Vorobyev, M., Matsumoto, Y., & Kawamura, S. (2008). Importance of Achromatic Contrast in Short-Range Fruit Foraging of Primates. *PLoS ONE*, *3*(10), e3356. https://doi.org/10.1371/journal.pone.0003356

Itti, L., & Koch, C. (2001). Computational modelling of visual attention. *Nature Reviews Neuroscience*, *2*(3), 194–203. https://doi.org/10.1038/35058500

Klimchuk, M. R., & Krasovec, S. A. (2012). *Packaging design: Successful product branding from concept to shelf*. John Wiley & Sons, Inc.

Land, M. F., & Nilsson, D. E. (2012). *Animal eyes*. Oxford University Press.

Lohse, G. L. (1997). Consumer eye movement patterns on yellow pages advertising. *Journal of Advertising*, *26*(1), 61–73. https://doi.org/10.1080/00913367.1997.10673518

Meißner, M., Musalem, A., & Huber, J. (2016). Eye Tracking Reveals Processes That Enable Conjoint Choices to Become Increasingly Efficient with Practice. *Journal of Marketing Research*, *53*(1), 1–17. https://doi.org/10.1509/jmr.13.0467

Menon, R. G. V., Sigurdsson, V., Larsen, N. M., Fagerstrøm, A., & Foxall, G. R. (2016). Consumer attention to price in social commerce: Eye tracking patterns in retail clothing. *Journal of Business Research*, *69*(11), 5008–5013. https://doi.org/10.1016/J.JBUSRES.2016.04.072

Milosavljevic, M., Navalpakkam, V., Koch, C., & Rangel, A. (2012). Relative visual saliency differences induce sizable bias in consumer choice. *Journal of Consumer Psychology*, *22*(1),

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

67–74. https://doi.org/10.1016/j.jcps.2011.10.002

Ministry of Food, A. and F. (2013). Lov om Fødevarer. Lovtidende A 250, 1–10.

Ministry of Food, A. and F. Bekendtgørelse om økologiske fødevarer og økologisk akvakultur m.v. (2015). Denmark.

Münscher, R., Vetter, M., & Scheuerle, T. (2016). A Review and Taxonomy of Choice Architecture Techniques. *Journal of Behavioral Decision Making*, *29*(5), 511–524. https://doi.org/10.1002/bdm.1897

Navalpakkam, V., Kumar, R., Li, L., & Sivakumar, D. (2012). Attention and selection in online choice tasks. In J. Masthoff, B. Mobasher, M. Desmarais, & R. Nkambou (Eds.), *User modeling, adaptation, and personalization* (pp. 200–211). Berlin Heidelberg: Springer.

Nordfang, M., Dyrholm, M., & Bundesen, C. (2013). Identifying bottom-up and top-down components of attentional weight by experimental analysis and compu- tational modeling. *Journal of Experimental Psychology. General*, *142*(2), 510–535.

Orquin, J. L., Bagger, M. P., & Mueller Loose, S. (2013). Learning affects top down and bottom up modulation of eye movements in decision making. *Judgment and Decision Making*, *8*(6).

Orquin, J. L., Chrobot, N., & Grunert, K. G. (2017). Guiding Decision Makers' Eye Movements with (Un)Predictable Object Locations. *Journal of Behavioral Decision Making*. https://doi.org/10.1002/bdm.2060

Orquin, J. L., & Holmqvist, K. (2017). Threats to the validity of eye-movement research in psychology. *Behavior Research Methods*. https://doi.org/10.3758/s13428-017-0998-z

Orquin, J. L., & Lagerkvist, C. J. (2015). Effects of salience are both short- and long-lived. *Acta Psychologica*, *160*, 69–76. https://doi.org/10.1016/j.actpsy.2015.07.001

Orquin, J. L., & Mueller Loose, S. (2013). Attention and choice: A review on eye movements in decision making. *Acta Psychologica*, *144*(1), 190–206. https://doi.org/10.1016/j.actpsy.2013.06.003

Orquin, J. L., Perkovic, S., & Grunert, K. G. (2018). Visual biases in decision making. *Applied Economic Perspectives & Policy*.

Orquin, J. L., Ashby, N. J. S., & Clarke, A. D. F. (2016). Areas of interest as a signal detection problem in behavioral eye-tracking research. *Journal of Behavioral Decision Making*, *29*(2–3), 103–115. https://doi.org/10.1002/bdm.1867

Otterbring, T., Shams, P., Wästlund, E., & Gustafsson, A. (2013). Left isn't always right: placement of pictorial and textual package elements. *British Food Journal*, *115*(8), 1211–1225.

25

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

https://doi.org/10.1108/BFJ-08-2011-0208

Otterbring, T., Wästlund, E., Gustafsson, A., & Shams, P. (2014). Vision (im)possible? The effects of in-store signage on customers' visual attention. *Journal of Retailing and Consumer Services*, *21*(5), 676–684. https://doi.org/10.1016/J.JRETCONSER.2014.05.002

Parkhurst, D., Law, K., & Niebur, E. (2002). Modeling the role of salience in the allocation of overt visual attention. *Vision Research*, *42*(1), 107–123. Retrieved from http://www.ncbi.nlm.nih.gov/pubmed/11804636

Peschel, A. O., & Orquin, J. L. (2013). A review of the findings and theories on surface size effects on visual attention. *Frontiers in Psychology*, *4*, 21–30. https://doi.org/10.3389/fpsyg.2013.00902

Peschel, A. O., Orquin, J. L., & Mueller Loose, S. (2019). Increasing consumers' attention capture and food choice through bottom-up effects. *Appetite*, *132*, 1–7. https://doi.org/10.1016/J.APPET.2018.09.015

Pieters, R., Warlop, L., & Wedel, M. (2002). Breaking Through the Clutter: Benefits of Advertisement Originality and Familiarity for Brand Attention and Memory. *Management Science*, *48*(6), 765–781. https://doi.org/10.1287/mnsc.48.6.765.192

Pieters, R., & Wedel, M. (2004). Attention capture and transfer in advertising: brand, pictorial, and text-size effects. *Journal of Marketing*, *68*(2), 36–50. https://doi.org/10.1509/jmkg.68.2.36.27794

Pieters, R., Wedel, M., & Batra, R. (2010). The Stopping Power of Advertising: Measures and Effects of Visual Complexity. *Journal of Marketing*, *74*(5), 48–60. https://doi.org/10.1509/jmkg.74.5.48

Reutskaja, E., Nagel, R., Camerer, C. F., & Rangel, A. (2011). Search dynamics in consumer choice under time pressure: An eye-tracking study. *American Economic Review*, *101*(2), 900–926. https://doi.org/10.1257/aer.101.2.900

Rutishauser, U., & Koch, C. (2007). Probabilistic modeling of eye movement data during conjunction search via feature-based attention. *Journal of Vision*, *7*(6), 5. https://doi.org/10.1167/7.6.5

Sütterlin, B., Brunner, T. A., & Opwis, K. (2008). Eye-tracking the cancellation and focus model for preference judgments. *Journal of Experimental Social Psychology*, *44*(3), 904–911. https://doi.org/10.1016/j.jesp.2007.09.003

Tatler, B. W., Hayhoe, M. M., Land, M. F., & Ballard, D. H. (2011). Eye guidance in natural

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

vision: Reinterpreting salience. *Journal of Vision*, *11*(5), 5–5. https://doi.org/10.1167/11.5.5

Towal, R. B., Mormann, M., & Koch, C. (2013). Simultaneous modeling of visual saliency and value computation improves predictions of economic choice. *Proceedings of the National Academy of Sciences of the United States of America*, *110*(40), E3858-67. https://doi.org/10.1073/pnas.1304429110

Valenzuela, A., & Raghubir, P. (2009). Position-based beliefs: The center-stage effect. *Journal of Consumer Psychology*, *19*(2), 185–196. https://doi.org/10.1016/j.jcps.2009.02.011

Valenzuela, A., & Raghubir, P. (2015). Are consumers aware of top–bottom but not of left–right inferences? Implications for shelf space positions. *Journal of Experimental Psychology: Applied*, *21*(3), 224–241. https://doi.org/10.1037/xap0000055

Valenzuela, A., Raghubir, P., & Mitakakis, C. (2013). Shelf space schemas: Myth or reality? *Journal of Business Research*, *66*(7), 881–888. https://doi.org/10.1016/j.jbusres.2011.12.006

Wedel, M., & Pieters, R. (2006). *Eye Tracking for Visual Marketing. Foundations and Trends® in Marketing* (Vol. 1). Now Publishers, Inc. https://doi.org/10.1561/1700000011

Wedel, M., & Pieters, R. (2008). A Review of Eye-Tracking Research in Marketing. In N. K. Malhotra (Ed.), *in Review of Marketing Research, Vol. 4* (pp. 123–147). Armonk, NY: M.E. Sharpe.

Wästlund, E., Otterbring, T., Gustafsson, A., & Shams, P. (2015). Heuristics and resource depletion: eye-tracking customers' in situ gaze behavior in the field. *Journal of Business Research*, *68*(1), 95–101. https://doi.org/10.1016/J.JBUSRES.2014.05.001

Wästlund, E., Shams, P., & Otterbring, T. (2018). Unsold is unseen … or is it? Examining the role of peripheral vision in the consumer choice process using eye-tracking methodology. *Appetite*, *120*, 49–56. https://doi.org/10.1016/j.appet.2017.08.024

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

## Supplementary information

SI 1.1 Overview of versions, blocks and categories. Each experiment version samples five blocks, one from each category of products. The products shown in each block are represented in SI 1.2 to 1.6.

| Version | Milk | Cheese | Grated cheese | Yoghurt | Butter |
|---|---|---|---|---|---|
| Version 1 | Milk 0.1% 1 | Sliced - Mild  1 | Grated 1 | Neutral 1 | Hard 1 |
| Version 2 | Milk 0.1% 2 | Sliced - Mild  2 | Grated 2 | Strawbery 3 | Hard 2 |
| Version 3 | Milk 0.1% 3 | Sliced - Medium 1 | Grated 3 | Pear/Banana 1 | Hard 3 |
| Version 4 | Milk 0.1% 4 | Hard - Mild 1 | Grated 4 | Neutral 2 | Hard 4 |
| Version 5 | Milk 0.1% 1 | Hard - Medium 1 | Grated 5 | Pear/Banana 2 | Liquid 1 |
| Version 6 | Milk 0.1% 2 | Hard - Medium 2 | Grated 6 | Strawbery 1 | Liquid 2 |
| Version 7 | Milk 0.5% 1 | Sliced - Mild  3 | Grated 7 | Strawbery 2 | Hard 5 |
| Version 8 | Milk 0.5% 2 | Sliced - Medium 1 | Grated 8 | Pear/Banana 3 | Hard 6 |
| Version 9 | Milk 0.5% 3 | Sliced - Medium 2 | Grated 1 | Neutral 3 | Hard 7 |
| Version 10 | Milk 0.5% 4 | Hard - Mild 1 | Grated 2 | Neutral 4 | Hard 8 |
| Version 11 | Milk 0.5% 1 | Hard - Mild 2 | Grated 3 | Pear/Banana 4 | Liquid 3 |
| Version 12 | Milk 0.5% 2 | Hard - Medium 1 | Grated 4 | Strawbery 4 | Liquid 4 |
| Version 13 | Milk 1.5% 1 | Sliced - Mild  1 | Grated 5 | Pear/Banana 1 | Hard 1 |
| Version 14 | Milk 1.5% 2 | Sliced - Mild  2 | Grated 6 | Neutral 3 | Hard 2 |
| Version 15 | Milk 1.5% 3 | Sliced - Medium 2 | Grated 7 | Strawbery 1 | Hard 3 |
| Version 16 | Milk 1.5% 4 | Hard - Mild 2 | Grated 8 | Pear/Banana 2 | Hard 4 |
| Version 17 | Milk 1.5% 1 | Hard - Medium 3 | Grated 1 | Neutral 4 | Liquid 1 |
| Version 18 | Milk 1.5% 2 | Hard - Medium 4 | Grated 2 | Strawbery 2 | Liquid 2 |
| Version 19 | Milk 3.5% 1 | Sliced - Mild  4 | Grated 3 | Neutral 1 | Hard 5 |
| Version 20 | Milk 3.5% 2 | Sliced - Medium 3 | Grated 4 | Neutral 2 | Hard 6 |
| Version 21 | Milk 3.5% 3 | Sliced - Medium 4 | Grated 5 | Strawbery 3 | Hard 7 |
| Version 22 | Milk 3.5% 4 | Hard - Mild 3 | Grated 6 | Strawbery 4 | Hard 8 |
| Version 23 | Milk 3.5% 1 | Hard - Mild 4 | Grated 7 | Pear/Banana 3 | Liquid 3 |
| Version 24 | Milk 3.5% 2 | Hard - Medium 2 | Grated 8 | Pear/Banana 4 | Liquid 4 |

28

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

SI 1.2 Milk category blocks showing the product ID combinations for each block.

| Category | Block 1 | Block 2 | Block 3 | Block 4 |
|---|---|---|---|---|
| Milk 0.1% | 1000 | 1005 | 1000 | 1001 |
| | 1001 | 1006 | 1002 | 1003 |
| | 1002 | 1007 | 1004 | 1005 |
| | 1003 | 1008 | 1006 | 1007 |
| | 1004 | 1009 | 1008 | 1009 |
| Milk 0.5% | 1100 | 1106 | 1100 | 1101 |
| | 1101 | 1107 | 1102 | 1103 |
| | 1102 | 1108 | 1104 | 1105 |
| | 1103 | 1109 | 1106 | 1107 |
| | 1104 | 1110 | 1108 | 1109 |
| | 1105 | 1111 | 1110 | 1111 |
| Milk 1.5% | 1200 | 1206 | 1200 | 1201 |
| | 1201 | 1207 | 1202 | 1203 |
| | 1202 | 1208 | 1204 | 1205 |
| | 1203 | 1209 | 1206 | 1207 |
| | 1204 | 1210 | 1208 | 1209 |
| | 1205 | | 1210 | |
| Milk 3.5% | 1300 | 1305 | 1301 | 1300 |
| | 1301 | 1306 | 1303 | 1302 |
| | 1302 | 1307 | 1305 | 1304 |
| | 1303 | 1308 | 1307 | 1306 |
| | 1304 | | | 1308 |

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

SI 1.3 Cheese category blocks showing the product ID combinations for each block.

| Category | Block 1 | Block 2 | Block 3 | Block 4 |
|---|---|---|---|---|
| Medium | 2401 | 2408 | 2401 | 2403 |
| | 2403 | 2411 | 2404 | 2405 |
| | 2404 | 2416 | 2406 | 2407 |
| | 2405 | 2417 | 2408 | 2411 |
| | 2406 | 2418 | 2416 | 2417 |
| | 2407 | 2419 | 2418 | 2419 |
| Mild | 2301 | 2305 | 2302 | 2301 |
| | 2302 | 2306 | 2304 | 2303 |
| | 2303 | 2307 | 2306 | 2305 |
| | 2304 | 2308 | 2308 | 2307 |
| Sliced Medium | 2100 | 2106 | 2101 | 2100 |
| | 2101 | 2107 | 2103 | 2102 |
| | 2102 | 2108 | 2105 | 2104 |
| | 2103 | 2109 | 2107 | 2106 |
| | 2104 | 2110 | 2109 | 2108 |
| | 2105 | 2111 | 2111 | 2110 |
| Sliced Mild | 2000 | 2004 | 2000 | 2001 |
| | 2001 | 2005 | 2002 | 2003 |
| | 2002 | 2006 | 2004 | 2005 |
| | 2003 | 2007 | 2006 | 2007 |

SI 1.4 Grated cheese category blocks showing the product ID combinations for each block.

| Category | Block 1 | Block 2 | Block 3 | Block 4 | Block 5 | Block 6 | Block 7 | Block 8 |
|---|---|---|---|---|---|---|---|---|
| Grated cheese | 2600 | 2605 | 2610 | 2616 | 2612 | 2600 | 2601 | 2611 |
| | 2601 | 2606 | 2611 | 2617 | 2614 | 2602 | 2603 | 2613 |
| | 2602 | 2607 | 2612 | 2618 | 2616 | 2604 | 2605 | 2615 |
| | 2603 | 2608 | 2613 | 2619 | 2618 | 2606 | 2607 | 2617 |
| | 2604 | 2609 | 2614 | 2620 | 2620 | 2608 | 2609 | 2619 |
| | | | 2615 | | | 2610 | | |

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

SI 1.5 Yoghurt category blocks showing the product ID combinations for each block.

| Category | Block 1 | Block 2 | Block 3 | Block 4 |
|---|---|---|---|---|
| Plain | 3000 | 3007 | 3000 | 3001 |
| | 3001 | 3008 | 3002 | 3003 |
| | 3002 | 3010 | 3004 | 3005 |
| | 3003 | 3011 | 3007 | 3008 |
| | 3004 | 3012 | 3010 | 3011 |
| | 3005 | 3013 | 3012 | 3013 |
| Pear-banana | 3200 | 3205 | 3200 | 3201 |
| | 3201 | 3206 | 3202 | 3203 |
| | 3202 | 3207 | 3204 | 3205 |
| | 3203 | 3208 | 3206 | 3207 |
| | 3204 | 3209 | 3208 | 3209 |
| Strawberry | 3100 | 3105 | 3100 | 3101 |
| | 3101 | 3106 | 3102 | 3103 |
| | 3102 | 3107 | 3104 | 3105 |
| | 3103 | 3108 | 3106 | 3107 |
| | 3104 | 3109 | 3108 | 3109 |

SI 1.6 Butter category blocks showing the product ID combinations for each block.

| Category | Block 1 | Block 2 | Block 3 | Block 4 | Block 5 | Block 6 | Block 7 | Block 8 |
|---|---|---|---|---|---|---|---|---|
| Hard | 4000 | 4004 | 4000 | 4001 | 4008 | 4012 | 4008 | 4009 |
| | 4001 | 4005 | 4002 | 4003 | 4009 | 4013 | 4010 | 4011 |
| | 4002 | 4006 | 4004 | 4005 | 4010 | 4014 | 4012 | 4013 |
| | 4003 | 4007 | 4006 | 4007 | 4011 | 4015 | 4014 | 4015 |
| Liquid | 4100 | 4104 | 4100 | 4101 | | | | |
| | 4101 | 4105 | 4102 | 4103 | | | | |
| | 4102 | 4106 | 4104 | 4105 | | | | |
| | 4103 | 4107 | 4106 | 4107 | | | | |

THE VISUAL ECOLOGY OF PRODUCT PACKAGING

SI 1.7 Examples of product images used in Study 1. From left to right: liquid butter/margerine, skimmed milk, and fruit yoghurt.

  

SI 1.8. Experimental flow in Study 1



THE VISUAL ECOLOGY OF PRODUCT PACKAGING

SI 2.1 Examples of product stimuli in Study 2. On the left a product with a single target (Keyhole label), brand, and no distractors. On the right a product with the same target label and brand and 13 distractor labels.



SI 2.2 Experimental flow in Study 2



# EXHIBIT JJ

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT KK

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION



TWG0018075

# THE WINE
# AROMA WHEEL

©1990, 2002 A. C. Noble

The benefits of describing wines in specific terms, such as these on the Wine Aroma Wheel, are your greater enjoyment and appreciation of the wonderful world of wine, plus an enhanced ability to discriminate and remember wine flavors. Describing wine aroma is very simple with the help of this lexicon. Words are arranged in three tiers, from the most general in the center to the most specific in the outer ring. Terms for similar aromas are located adjacent to each other where possible. The distinctive aromas of varietal wines can often be recognized by the specific aroma notes listed to the right. To illustrate these terms, aroma standards can be made. For example, add a small amount of vanilla extract or piece of bell pepper to a neutral white or red wine as a reference for the vanilla or bell pepper aroma.

Much of the aroma in wine comes from the starting grapes and contributes to their distinctive, varietal flavors. Winemaking operations modify these aromas in characteristic ways. Malolactic fermentation produces a buttery aroma, for example, while aging in oak cooperage contributes vanilla and clove notes to Chardonnays and most red wines. In contrast, Muscat, Riesling and Gewürztraminer have citrus, lychee or floral notes which come from the grape. Similarly, Sauvignon Blanc from cool climates is recognizable by the presence of herbaceous (bell pepper or asparagus) notes which arise from the grape.

## Characteristic Varietal Wine Aromas

*Cabernet Sauvignon, Merlot, Malbec, Cabernet Franc (and red Bordeaux wines)*
Berry, vegetative or herbaceous (bell pepper, asparagus, olives), mint, black pepper, butter, vanilla, soy (in older wines).

*Pinot Noir and red Burgundies*
Berry, berry jam (strawberry), vanilla, buttery, spicy

*Zinfandel, Syrah, Shiraz, Petite Syrah*
Berry, black pepper, raisin, soy, butter, vanilla.

*Chardonnay (and white Burgundies)*
Fruity (apple, peach, citrus, pineapple), spicy (cloves, vanilla, butter.

*Sauvignon Blanc*
Floral, fruity (apple, peach, apricot), vegetative or herbaceous (bell pepper, asparagus), vanilla, butter, spicy (cloves).

*White Riesling (and white German wines)*
Floral, fruity (apple, peach, citrus, pineapple), honey.

*Gewürztraminer*
Floral, fruity (citrus, grapefruit, peach), honey, spice.

A. C. Noble • P.O. Box 72259, Davis, CA 95617-6239 USA • fax: 484.233.3149 • email: am@winearomawheel.com • www.winearomawheel.com

# EXHIBIT LL

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION



IMAGERY
ESTATE WINERY

VISIT US    OUR STORY    WINE CLUBS    SHOP WINES

FIND    ACCOUNT    SIGN IN    CART    Q

Last Updated: May 04, 2018

# Terms of Service

Please read these Terms of Service (this "Agreement") carefully. This Agreement is between you and The Wine Group LLC doing business as Imagery Estate Winery ("Company" or "we" or "us") concerning your use of (including any access to) Company's website, currently located at https://imagery19.wpengine.com/ (together with any materials and services available therein, and successor website(s) thereto, the "Site"). This Agreement hereby incorporates by this reference any additional terms and conditions with respect to the Site posted by Company to the Site, or otherwise made available to you by Company.

By clicking or tapping any button or box marked "accept," "agree" or "OK" (or a similar term) in connection with this Agreement, or by using the Site, you agree to be bound by this Agreement and affirm that you are of legal drinking age where you live and have the legal capacity to enter into this Agreement.

This Agreement contains a mandatory arbitration provision that, as further set forth in Section 19 below, requires the use of arbitration on an individual basis to resolve disputes, rather than jury trials or any other court proceedings, or class actions or class arbitrations of any kind.

1. **Changes.** We may change this Agreement from time to time by notifying you of such changes by any reasonable means, including by posting a revised Agreement through the Site. Any such changes will not apply to any dispute between you and us arising prior to the date on which we posted the revised Agreement incorporating such changes, or otherwise notified you of such changes.

Your clicking or tapping any button or box marked "Accept," "Agree" or "OK" (or a similar term) in connection with this Agreement, or your use of the Site, in each case following any changes to this Agreement will constitute your acceptance of such changes. We may, at any time and without liability or prior notice, modify or discontinue all or part of the Site (including access to the Site via any third-party links), charge, modify or waive any fees required to use the Site; or offer opportunities to some or all Site users. We reserve the right to introduce new features or functionality for which the payment of fees may be required.





# Reds

**2016 PETITE SIRAH**

dark berry, espresso, leather

Club Price: $36.00

Price: $45.00

**2016 PETIT VERDOT**

blackberry, plum, spice

Club Price: $33.60

Price: $42.00

**2015 PALLAS ESTATE MERLOT**

pepper, black tea, clove

Club Price: $52.00

Price: $65.00

# EXHIBIT MM

TO THE DECLARATION OF JOY DURAND
IN SUPPORT OF PLAINTIFF JaM CELLARS, INC.'S
MOTION FOR PRELIMINARY INJUNCTION







